**Mary Jill FAZAKERLY, Appellant,**

v.

**Mary C. FAZAKERLY, Appellee.**

**No. 11–98–00197–CV.**

Court of Appeals of Texas, Eastland.

May 27, 1999.

David Hooper, David L. Hooper & Associates, Abilene, for appellant.

Robert D. Batjer, Batjer & Wagstaff, Abilene, for appellee.

Panel consists of: ARNOT, C.J., and WRIGHT, J., and McCALL, J.

## OPINION

TERRY McCALL, Justice.

Mary Jill Fazakerly (Jill), independently and as the executrix of the Estate of George Mitchell Fazakerly (George), appeals the trial court's judgment in favor of her stepmother, Mary C. Fazakerly (Mary). We affirm, holding that: (1) the trial court did not err in striking Jill's pleadings challenging the validity of an antenuptial agreement; (2) Mary presented clear and convincing evidence to overcome the presumption of community property; and (3) the evidence was sufficient to support the jury's findings regarding reimbursement.

### Background

Jill was the daughter of George and his first wife. George met Mary, his second wife, soon after the death of her first husband, Paul K. Carroll (Paul). They married in 1973. Mary and Paul had owned and operated Paul Carroll Oxygen Equipment Company (the oxygen company) and what later became Paul Carroll Welding Supply, Inc. (the welding company). Both companies had their headquarters in Abilene, and they had operated at a loss for four years in a row.

Prior to their marriage, George insisted that he and Mary sign an antenuptial agreement because he did not want Mary's family to think that he was marrying her for her money. The antenuptial agreement provided:

1. That the separate property and estate of [Mary] shall remain her separate property and estate, including ... any right, title and interest in and to any businesses ... and that *[George] does hereby [release to Mary] any and all right, title and interest in and to [any] real or personal property now owned or to be owned in the future by [Mary], together with all income and increase derived therefrom.* (Emphasis added)

The antenuptial agreement also provided that Mary released any rights to any real or personal property then "presently owned" by George. It concluded:

6. It is further agreed that this agreement is entered into by each party with a full knowledge on the part of each as to the extent and probable value of the estate of the other ... and after a full disclosure by each of the parties to the other as to the extent and probable value of the estates.

During their marriage, George and Mary worked for the welding and oxygen companies. They both served as officers and directors of the companies and received compensation for those duties. In 1975, to insulate assets from potential liability for catastrophic accidents, the directors of the welding and oxygen companies formed Carroll Leasing Corporation Number One and Carroll Leasing Corporation Number Two (the leasing compa-

nies).[1] The assets of the welding and oxygen companies were transferred to the leasing companies at book value. The leasing companies then leased back the assets for use by the welding and oxygen companies. Stock in both leasing companies was issued to Mary, in her name only, as sole shareholder; and the books of each leasing company reflected the receipt of $1,000 for the stock from "M. Fazakerly."

The companies' profits and values increased after George began to help Mary. In 1984, Dixie Chemical Company offered to buy the Carroll companies' chlorine plant in Snyder. Mary declined the offer because she did not want to retire. George supported the idea of a sale to Dixie. After Mary declined to sell, George retired and executed a will naming Jill as his executrix and leaving his entire estate to Jill. George also gave Jill the key to a safe deposit box rented in his name only with instructions to open the box upon his death. After George died, Jill opened the box and found, among other things, this note:

Jill,

I feel like you will need this information in case something happens to me. First, when Mary persuaded me to save her firm, her son David who was President at the time, declared the firm bankrupt. He notified all of her suppliers and banks that the firm was bankrupt. When I decided to retire, she had a standing offer of $2,000,000.00 from Reed Morian of Dixie Petro–Chem of Houston, Texas. I feel like I am responsible for bringing the company from declared bankrupt to $2,000,000.00. Make sure your lawyer sees all of the information in this lock box.

Dad

George died in 1992. On May 21, 1993, Jill and Mary entered into a "Partial Settlement Agreement" whereby they settled the disposition of some of the property and liabilities involved in George's estate. The settlement agreement specifically mentioned the antenuptial agreement and preserved Mary's right to assert it as a defense if Jill should make any claim for community reimbursement for increases in the value of stock in Mary's name and claimed by her as separate property. On August 18, 1993, Jill filed suit against Mary. The original petition sought, among other things, a declaratory judgment that the stock in the leasing companies was part of the community estate and a declaratory judgment that the community estate was entitled to reimbursement for George's efforts in managing the welding and oxygen companies because the companies had appreciated in value during George and Mary's marriage. On June 1, 1998, Jill filed her second amended petition, adding a claim seeking a declaratory judgment that the antenuptial agreement was void.

Mary argued limitations, estoppel, and laches in a motion to strike Jill's pleading that the antenuptial agreement was invalid. The court granted the motion. Following four days of trial, the jury returned findings that 100 percent of the stock in both leasing companies was Mary's separate property, that the community estate was not entitled to reimbursement from Mary's separate estate, and that Mary's separate estate was not entitled to an offset against any reimbursement claim.

### The Antenuptial Agreement

■ Jill argues in her first issue that the trial court erred in striking her amended pleadings challenging the validity of the antenuptial agreement. George died on October 21, 1992. As noted above, Jill challenged the validity of the antenuptial agreement in her second amended petition filed on June 1, 1998.[2] Mary's first ground

---

1. The four companies are collectively referred to herein as "the Carroll companies."

2. Mary's motion to strike alleges that the second amended petition was the first pleading to challenge the agreement. Jill's response to the motion to strike and her brief both assert

in her motion to strike the amended pleadings was:

1. [Jill's] challenge to the enforceability and/or validity of the "Prenuptial Agreement" is barred by limitations pursuant to Section 4.008, Texas Family Code.

George and Mary signed the antenuptial agreement on March 28, 1973. Jill contends that the trial court should not have granted Mary's motion because it was based on TEX. FAM. CODE ANN. § 4.008 (Vernon 1998) which did not become effective until April 17, 1997 and was not retroactive. Jill argues that former TEX. FAM. CODE § 5.46 (1993)(recodified, now TEX. FAM. CODE ANN. § 4.006 (Vernon 1998)) applies to the antenuptial agreement because Section 5.46 was in effect on the date of George's death and was applicable to premarital agreements entered on or before that date. Her contention is correct to the extent that Section 5.46 applies to determining the "enforceability" of the antenuptial agreement, but Section 5.46 is inapposite as to whether the trial court erred in striking the pleadings. The question concerning "enforceability" of the antenuptial agreement differs from the question of when a challenge to the enforceability must be brought or be barred by limitations.

It is clear that Mary argued limitations to the trial court despite her erroneous assertion that the antenuptial agreement was "barred by limitations pursuant to Section 4.008, Texas Family Code." The applicable statutes of limitations most favorable to Jill, both at the time of George's death and now, provide for a four-year period.[3] Section 4.008 and its predecessor TEX. FAM. CODE § 5.48 (1993) urged by Mary deal with the tolling of limitations; these sections are not statutes of limitations.

At the time of George's death, former Section 5.48 (now Section 4.008) addressed the tolling of any statute of limitations governing actions involving premarital agreements:

Any statute of limitations applicable to an action asserting a claim for relief under a premarital agreement is tolled during the marriage of the parties to the agreement. However, equitable defenses limiting the time for enforcement, including laches and estoppel, are available to either party.

Section 4.008 is a recodification of former Section 5.48. Section 4.008 is identical to Section 5.48 with the exception of the first word. Section 4.008 now reads: "*A* statute of limitations. . . ." (Emphasis added) Section 5.48 was in effect at the time of George's death, but Section 4.008 would have the same effect: the four-year statutes were tolled during George and Mary's marriage.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.062 (Vernon 1997) further tolls an applicable statute of limitations for 12 months after the death of a person against whom or in whose favor there may be a cause of action. George died on October 21, 1992; Section 16.062 would toll the commencement of the four-year period only to October 21, 1993, one year after George's death. Jill did not challenge the

---

that her first amended petition also challenged the validity of the antenuptial agreement, but neither states a filing date for that pleading. The clerk's record does not contain the first amended petition. Under these facts, we will consider June 1, 1998, to be the date of Jill's first challenge to the agreement.

3. Claims of fraud in connection with a contract are governed by the four-year limitation in TEX. CIV. PRAC. & REM. CODE ANN. § 16.051 (Vernon 1997). *Williams v. Khalaf*, 802 S.W.2d 651 (Tex.1990). Although many

breach of contract claims also appear to be governed by Section 16.051, the residual statute, the Texas Supreme Court has interpreted broadly the term "debt" in TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 1986) to include actions for breach of contract. See *Franco v. Allstate Insurance Company*, 505 S.W.2d 789, 791–92 (Tex.1974). The only important point for this case is that even the four-year period was exceeded before a claim was asserted.

validity of the antenuptial agreement until May 12, 1998, months after the final limitations date of October 21, 1997.

■ Despite tolling commencement of limitations, former Section 5.48 provided that laches and estoppel are available to either party; Mary asserted both in her motion to strike Jill's pleadings. The elements of laches are: (1) unreasonable delay by one having legal or equitable rights in asserting them and (2) a good faith change in position by another to his detriment because of the delay. *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex.1989). The record reflects that Jill knew about the antenuptial agreement when she and Mary signed the settlement agreement in May 1993. Jill asserted her claims against the antenuptial agreement five years after signing the settlement agreement. At the time Jill filed her second amended petition, Mary had been confined with Alzheimer's disease. She was no longer competent or even able to testify; her position had changed during the delay. Jill's claims, regardless of any statute of limitations, were barred by laches. That equitable doctrine attempts to prevent injustice against one party that could result when another asserts his demands so long after they matured that evidence has been lost or impaired. *Walet v. Haskins*, 68 Tex. 418, 4 S.W. 596, 598–99 (1887); *De Benavides v. Warren*, 674 S.W.2d 353, 362 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). Laches provided another ground for the trial court to strike Jill's pleadings attacking the antenuptial agreement's validity.

■ Because either limitations or laches was adequate to support the trial court's ruling, we need not address appellee's argument that George (and his executrix, Jill) would have been estopped to challenge the antenuptial agreement. We

note, however, that the evidence shows that the antenuptial agreement was George's idea. Letters written by George to Mary prior to their marriage were introduced at trial. One letter contained a shorter antenuptial agreement signed by George that provided essentially the same things as the one George and Mary both signed. Other letters expressed George's wish that others not think he was marrying Mary for her money, for example:

> I felt in the beginning you would be criticised (sic) and I would be accused of marrying you for your money. Hence, the premarital agreement. I could never, never feel entitled to anything that you and your family worked for and earned before I married you. I am thoroughly confident that you realize this. *The premarital agreement was my idea, not yours.* (Emphasis added)

All the evidence in the record indicates that George voluntarily entered the agreement, that he never objected to its provisions, and that he accepted the benefits of the marital property arrangements.

■ Moreover, to invalidate an antenuptial agreement, a party must first show either that he did not sign voluntarily or that the agreement is unconscionable and then that certain conditions regarding disclosure of the other party's estate were not met.[4] Former Section 5.46, recodified as Section 4.006. The issue of unconscionability must be decided by the trial court as a matter of law before the disclosure questions are addressed. Former Section 5.46(b). The mere fact that a party made a hard bargain does not allow him relief from a freely and voluntarily assumed contract; parties may contract almost without limitation regarding their property. *Marsh v. Marsh*, 949 S.W.2d 734, 741 (Tex. App.—Houston [14th Dist.] 1997, no writ).

---

4. After establishing unconscionability, the party must show that: (1) he was not provided a fair and reasonable disclosure of the other party's financial obligations or property; (2) he did not voluntarily and expressly waive, in writing, any right to that disclosure; and (3) he did not have, or reasonably could not have had, adequate knowledge of the other party's property or financial obligations.

■ Jill's principal argument is that Mary did not disclose the full condition of her companies to George before they entered into the antenuptial agreement in 1973. As noted above, the agreement recites that both George and Mary had "full knowledge ... as to the extent and probable value of the estate of the other." The language of a contract should be given its plain grammatical meaning. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987). Where a contract is unambiguous, parol and extrinsic evidence should be excluded. *State Farm Mutual Automobile Insurance Company v. Azima*, 896 S.W.2d 177, 178–79 (Tex.1995). The trial court may have properly struck the pleadings regarding the antenuptial agreement because the court found it valid and enforceable.[5]

For the foregoing reasons, we hold that the trial court did not err in striking the pleadings regarding the antenuptial agreement's validity, and we overrule Jill's first issue.

### Status of the Leasing Company Stock

■ Jill argues in her second issue that the evidence was insufficient to support the jury's answers to Question No. 1 that the stock in both leasing companies was Mary's separate property. She contends that Mary did not offer clear and convincing evidence to overcome the presumption contained in former TEX. FAM. CODE § 5.02 (1993), recodified at TEX. FAM. CODE ANN. § 3.003 (Vernon 1998), that the stock was community property because Mary acquired the stock during her marriage to George. The trial court's charge defined clear and convincing evidence as the "measure or degree of proof that produces a firm belief or conviction that the allegations sought to be established are true." See FAMILY, TEXAS PATTERN JURY CHARGES PJC 202.10 (1998 ed.).[6]

As the businesses originally existed, the oxygen company owned assets and leased them to the welding company. Jill admits that, from George and Mary's marriage until George's death, the welding and oxygen companies were Mary's separate property. In 1975, the two leasing companies were formed, and some of the assets from the oxygen company and the welding company were transferred at book value to each leasing company. The transfers appeared as accounts payable on the books of the leasing companies and as accounts receivable on the books of the welding and oxygen companies. The leasing companies then leased the assets back to the welding and oxygen companies for use in business. The record shows that the leasing companies were an effort to avoid liability in the case of a catastrophic accident involving transporting gases.

The boards of directors of the oxygen and welding companies, which included George and Mary, established the leasing companies by resolution and transferred the assets to them. The boards also approved resolutions whereby Mary would buy 60,000 shares of stock in each leasing company for the total sum of $2,000. Stock certificates introduced into evidence for each leasing company were issued only in the name of "Mary Carroll Fazakerly." A fair inference from the evidence is that Mary's net equity in the Carroll companies was the same as it was in the two companies before the reorganization.

The books of each leasing company reflect the receipt of $1,000 from "M. Fazak-

**5.** Jill also contends that the antenuptial agreement is void because it violated TEX. CONST. art. XVI, § 15. We disagree with this argument as well. *Beck v. Beck*, 814 S.W.2d 745 (Tex.1991).

**6.** Section 3.003's requirement of clear and convincing evidence to overcome the community property presumption involves a different standard of review. It is the duty of the appellate court in reviewing all the evidence to determine whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. See *Wetzel v. Wetzel*, 715 S.W.2d 387 (Tex.App.—Dallas 1986, no writ).

erly." Mary's expert witness testified that, following the receipt of $1,000, the leasing companies disbursed funds for various expenses. Because no other funds were deposited prior to the disbursements, the expert concluded that the $1,000 was paid in cash, rather than in services or other consideration. Neither Mary nor Jill could locate a canceled check or any other record of cash being paid for the stock. Mary's expert testified, however, that, from his review of George and Mary's community bank accounts, the check was not issued on a community account and that the funds were not community property. There was, however, evidence that Mary had a substantial amount of cash available from the sale of some of her first husband's assets after his death.

The president of Dixie Chemical Company testified that in 1984 he offered to pay Mary $2,000,000 for the companies and to pay George a $200,000 "finder's fee." The Dixie president testified that the decision whether to sell the companies was Mary's alone and that George recognized this. The Dixie president testified that, during his negotiations with her, Mary and George presented him with a list of assets for the four Carroll companies. The list was introduced into evidence. It concluded with the notation: "Stock in all companies and real estate owned solely by Mary Carroll Fazakerly." Mary elicited testimony that the owner of stock would rarely be paid a finder's fee for arranging the sale of the stock. The antenuptial agreement provided that George released any claim in "any other real or personal property . . . to be owned in the future by the said Mary."

Based on all this evidence, the jury could properly conclude that Mary overcame the presumption of community property by clear and convincing evidence. We hold that the evidence is sufficient to support the jury's answer to Question No. 1, and we overrule Jill's second issue.

*Reimbursement Claims*

Jill argues in her third issue that the evidence is legally and factually insufficient to support the jury's answer to Question No. 2 that George and Mary's community estate was not entitled to reimbursement for its contributions that enhanced the value of Mary's separate estate. To assess a legal sufficiency point, we must view the evidence presented in the light most favorable to the prevailing party to determine whether it permits the logical inference that the jury must reach. *Transportation Insurance Company v. Moriel*, 879 S.W.2d 10, 24 (Tex.1994); *Lyons v. Millers Casualty Insurance Company of Texas*, 866 S.W.2d 597, 600 (Tex.1993). We disregard any evidence that is contrary to the verdict. Lyons v. Miller Casualty Insurance Company of Texas, supra. If the proffered evidence as a whole rises to a level that would enable reasonable minds to differ, we must find the evidence to be legally sufficient. *Transportation Insurance Company v. Moriel*, supra at 25. To assess a factual sufficiency point, we must examine the entire record to determine if there is some evidence to support the finding; if so, we must determine in light of the entire record whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

A right to reimbursement arises when the time, toil, and labor of the community estate are expended to enhance and benefit one spouse's separate estate, and the community is inadequately compensated for those contributions. *Jensen v. Jensen*, 665 S.W.2d 107, 109 (Tex.1984); *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex.1982). The community is not entitled to reimbursement for the time and effort expended in preserving and maintaining one spouse's separate property or on any enhanced value of the separate property. *Jensen v. Jensen*, supra at 110; Vallone v.

Vallone, supra. The community cannot claim reimbursement for increases in the value of separate property caused by the market or general economy. *Dawson–Austin v. Austin*, 920 S.W.2d 776, 788 (Tex.App.—Dallas 1996, reversed on other grounds, 968 S.W.2d 319 (Tex.1998).

Jill contended at trial that the Carroll companies, specifically the oxygen and welding companies, had increased dramatically in value during the time of George and Mary's marriage. Jill adduced evidence at trial that the companies had gone from reporting tax losses in 1973, the year of the marriage, to a combined taxable income of over $75,000 in 1991, the year prior to George's death. The combined retained earnings and capital of the welding and oxygen companies increased over $600,000 between those years.

Jill's expert witness testified that the companies had a fair market value of $2,000,000 at the time of George's death. The expert based his estimate largely on the 1984 offer that Dixie Chemical Company made to buy the chlorine plant for $2,000,000. The Dixie president, however, testified that the 1984 offer was based on factors other than the market value of the plant or the companies; the offer considered such factors as the costs of building a new chlorine plant and obtaining new operational permits for it. The Dixie president also testified that the offer was not a "standing" one as described in George's safe deposit box note but was a one-time-only offer that terminated when Dixie had to commence the process of building a new chlorine plant for itself.

Mary's expert testified that the growth in the Carroll companies' gross sales tracked the growth in gross sales for Abilene. Mary's expert had performed a study comparing the two figures from 1974 to 1990, and he introduced a chart setting forth his findings. The chart shows an extremely close correlation between the Abilene economy and the companies' growth. Mary's expert testified that he believed the economy and market forces were as much responsible for any increase in value as George's talents or efforts.

In her deposition read at trial, Mary testified that she and George "talked [the business], ate it, and worked it, just as many hours a day as we could." Mary's CPA, Darrell Knight, testified that many times he went to the companies' offices in the afternoon, only to find that Mary and George were gone for the day. Other testimony showed that Mary and George only worked five to eight hours a day. Even Jill's expert testified that market forces could have played a role in the companies' growth, but he maintained that George was "lucky" and that his efforts also contributed.

Mary's expert testified that, over the marriage, the community had received $1,205,692 in the form of wages, director fees, interest and dividends, and rental income from Mary's separate property. Mary's expert testified that this figure was "adequate" compensation for the community estate for any increase in the companies' value caused by community effort. Jill's expert testified that $1,200,000 would "be getting close" to being adequate compensation to the community for its efforts in enhancing the companies' value.

Finally, the antenuptial agreement provided that George released any claim to the "income or increase derived" from Mary's separate property. We hold that the record contains legally and factually sufficient evidence to support the jury's answer to Question No. 2. We overrule Jill's third issue.

### *This Court's Judgment*

We affirm the trial court's judgment.