

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-08-00201-CV

THERESA ANN SANDERS                    APPELLANT
                                       AND APPELLEE

V.

ROYCE ALLEN SANDERS                    APPELLEE
                                       AND APPELLANT

------------

FROM THE 360TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant/Cross-Appellee Theresa Ann Sanders and Appellee/Cross-Appellant Royce Allen Sanders appeal from the trial court's judgment granting their divorce.  No children were born of the marriage; the issues concern only the trial court's characterization of marital property and division of the community estate.  Royce contends that mental incapacity is not a valid ground for setting aside the

---

[1] See Tex. R. App. P. 47.4.

couple's two postnuptial agreements and that the evidence is legally and factually insufficient to support the trial court's finding that Theresa lacked the mental capacity to execute the agreements. Theresa contends that the trial court erred by characterizing as separate three commercial lots of real property and the improvements thereon (collectively, "the Property") conveyed to Royce during the marriage by the closely held class C corporation he had owned since before the marriage. Because we hold that the trial court did not err, we affirm the trial court's judgment.

**Mental Incapacity**

During the marriage, Royce and Theresa executed two separate postnuptial agreements, one in November 1997 and one in May 1999. In the divorce decree, the trial court found that Theresa lacked the mental capacity to voluntarily enter into the agreements. In the findings of fact and conclusions of law issued after our abatement of this case, the trial court also found that Theresa "did not voluntarily execute the November 1997 Post-Nuptial Agreement and the May 1999 Post-Nuptial Agreement because she did not have the mental capacity to do so." The trial court therefore concluded that the two postnuptial agreements were not enforceable.

In his first issue, Royce contends that mental incapacity is not a ground for setting aside a postnuptial agreement. He is technically correct. The controlling statute provides that involuntariness and unconscionability are the exclusive

2

defenses to partition and exchange agreements.[2] There is no dispute that both the 1997 and the 1999 postnuptial agreements are partition and exchange agreements. Royce concedes, however, that the trial court found that Theresa involuntarily executed the agreements based on her mental incapacity. Further, we agree with our sister court in Austin that common law contract defenses may influence our analysis of voluntariness, which is not defined in the statute.[3] Mental incapacity is a common law contract formation defense.[4] Accordingly, whether Theresa had mental capacity to contract when she executed the agreements can and will inform our analysis of voluntariness. We therefore overrule Royce's first issue.

In his second issue, Royce contends that the evidence is legally and factually insufficient to support the trial court's finding that Theresa lacked the mental capacity to execute the agreements. Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions.[5] The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to

---

[2] *See* Tex. Fam. Code Ann. § 4.105(a), (c) (Vernon 2006).

[3] *See Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 695–98 (Tex. App.—Austin 2005, pet. denied); *see also* Tex. Fam. Code Ann. § 4.105.

[4] *In re Morgan Stanley & Co.*, 293 S.W.3d 186, 187 (Tex. 2009) (orig. proceeding).

[5] *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

support them by the same standards that are applied in reviewing evidence supporting a jury's answer.[6]

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[7] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[8]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence

---

[6] ... *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

[7] ... *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).

[8] ... *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

4

supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[9]

As the Austin court points out, "The ordinary meaning of 'voluntarily,' as reflected in dictionary definitions, entails (1) intentional action, as opposed to inadvertent or accidental action, (2) that is the product of the exercise of free will."[10] To show mental incapacity, a person seeking to set aside an agreement must show that she did not understand the nature and consequences of her act at the time the agreement was made.[11] Whether a person had mental capacity to enter into an agreement can be shown by circumstantial evidence including, for example, (1) her outward conduct demonstrating an "inward and causing condition"; (2) preexisting external circumstances tending to produce a special mental condition; and (3) a mental condition before or after the relevant point in time from which her mental capacity or incapacity could be inferred.[12] Generally, the issue of mental incapacity

---

[9] _Pool v. Ford Motor Co._, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); _Garza v. Alviar_, 395 S.W.2d 821, 823 (Tex. 1965); _In re King's Estate_, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

[10] _Sheshunoff_, 172 S.W.3d at 695 (footnote omitted).

[11] _Mandell & Wright v. Thomas_, 441 S.W.2d 841, 845 (Tex. 1969); _Rowland v. Herren_, No. 03-07-00247-CV, 2010 WL 566881, at *2 (Tex. App.—Austin Feb. 19, 2010, no pet.) (mem. op.).

[12] _Bach v. Hudson_, 596 S.W.2d 673, 676 (Tex. Civ. App.—Corpus Christi 1980, no writ); _Rowland_, 2010 WL 566881, at *2.

is an issue of fact.[13]  Further, the necessary proof of mental incapacity is within the common knowledge and experience of laypersons; therefore, expert testimony is not required.[14]

Royce, Theresa, and Ann Beal, Theresa's licensed professional counselor, testified.  Additionally, several exhibits were admitted, most containing Theresa's medical records.

Theresa testified that she was forty-three years old at the time of trial, that she had four adult children, and that she had been married five times, twice to Royce, whom she had first met in February 1985.  When they met, Theresa "was dabbling" in "[m]ethamphetamines, street drugs, [and] speed," but she denied using drugs after they started dating. Three months after they met, Royce moved in with Theresa and her children, even though he was still married.  The next month, he rented a house in Grapevine, where they all lived until August 1, 1985, when he reconciled with his wife.  Theresa and the children moved in with her parents, but she still saw Royce.

Theresa testified that she got pregnant in the fall of 1985 and that Royce told her that she could either terminate the pregnancy or raise the baby alone, so she terminated the pregnancy in January 1986.  As a result of the abortion, her uterus

---

[13] ... *Fox v. Lewis*, 344 S.W.2d 731, 739 (Tex. Civ. App.—Austin 1961, writ ref'd n.r.e.); *see Bank of Commerce v. Barton*, 605 S.W.2d 638, 639 (Tex. Civ. App.—Fort Worth 1980, writ dism'd).

[14] ... *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.); *Estate of Riggins*, 937 S.W.2d 11, 19 (Tex. App.—Amarillo 1996, writ denied).

had to be removed six weeks later, and within six months, her ovaries stopped functioning. Theresa was on Medicaid at the time of her surgery because she had no insurance. On cross-examination, Theresa admitted that she had also had an abortion in the period between her first and second marriages.

Theresa testified that also in January 1986, she and her children moved into a house that Royce had rented for them, and he moved in with them in February. As of January 1986, Theresa testified, she had never had any drug treatment or psychiatric or psychological care.

In 1988, they all moved to a house in Bedford. In May 1988, Theresa started using methamphetamines again. Her usage increased, and she "started using more and more and more and more." She did not obtain any drug treatment in this period.

Theresa testified that a doctor, "Uncle Mike," had had sexual intercourse with her from the time she was seven years old until she was sixteen years old. She testified that her father started "messing with [her]" when she was almost four years old and had penetrated her on Christmas Eve when she was seven years old. Her father's sexual abuse of her continued until she was in her early twenties. During the long period over which the sexual abuse occurred, she did not seek and was not provided any psychological treatment.

Theresa testified that the first time she went to a treatment center for drug use or psychological problems was in 1989 or 1990, when she went to Rio Valley Recovery Center for depression. She said that she was hospitalized for severe

7

depression and was very suicidal. She testified that she had taken "a bunch or Royce's pills." She stated that Royce had not wanted her to go to the facility. He testified that he did not know when she left home to go to the center and that he went there to visit her. According to Theresa, she was diagnosed at the center with severe depression and post-traumatic stress syndrome. She was prescribed Pamelor but did not take it after she left the center.

In 1990 or 1991, Theresa traveled to Las Vegas and confronted her mother about the doctor's sexual abuse of her. She testified that she then began seeing Dr. Webster, who diagnosed her as being bipolar in 1991. Royce testified on cross-examination that "[s]he had been diagnosed with everything," and he could not remember when she was first diagnosed as bipolar. Theresa stated that she believed Dr. Webster placed her on Lithium, Tegretol, Depakote, and an anti-anxiety drug. She testified that she tried to take the prescribed medication on a daily basis until sometime after 1993, when she had no health insurance. While she was taking the medication, "the more [she] was facing issues and dealing with stuff, the more it seemed like [she] would override it, and it just wasn't working." Theresa's breast implants also ruptured during this time period. At the end of 1994, Royce divorced his first wife.

Theresa testified that she sought treatment at JPS Trinity Springs Hospital in late March or early April 1995. She stated that before she sought treatment, she had tried to commit suicide, she had lost her breast, she could not walk and was

paralyzed from the waist down, she was in a wheelchair, and she had just gone through chemotherapy. Theresa stayed at the hospital for a month. She testified that she took medication for her bipolar condition while in the hospital and that it was covered by Medicaid. According to Theresa, when she left the hospital, she was on Zoloft, Depakote, and an anti-anxiety drug.

Theresa sought MHMR treatment in February 1995 and also attended a May 1995 appointment. She was discharged in November 1995 for failing to follow up.

On August 1, 1995, Theresa and Royce married in Jamaica. When they returned home, they discovered her son "collecting blood in a vial." Theresa testified that "Royce said [they were] going to have to get an annulment. And then [she] was going to have to get on Medicaid because he could not pay for [her son's treatment.]" He did not dispute her testimony. The marriage was annulled on August 24, 1995. But the couple did not stop living together.

Theresa stated that she did not take her prescribed medication for her bipolar condition until she "got back on Medicaid again, because [they] had no insurance." She also testified that she was back on it around Christmas 1995, and after that, Royce hired her, and she had health insurance under his company policy. She additionally testified that she believed that she took the medication as prescribed until she lost her Medicaid in December 1995, when she remarried Royce.

Theresa described 1995 as one of her hardest times:

I came out about my father. My kids were not doing good, at all. I wasn't a good mom. I couldn't walk. I had a daughter inpatient while I was inpatient. My [other] daughter . . . pushed my wheelchair over there so I could see her. And Royce walked beside her. He couldn't handle pushing the wheelchair that I was in.

She stated that in 1995, she was still in denial about the bipolar diagnosis but had started to believe that it was possible. Theresa testified that before her marriage, she "didn't see the manic. All [she saw] was the depression." When asked if she recalled how she felt when she was manic, she stated, "All I know is I didn't sleep. That's all I remembered. I don't remember the high. It felt like a low. I hurt. It felt like a low. That was depression to me."

Theresa testified that she believed that she continued to take her prescribed medication in 1996, when she was seeing Dr. Bernard Rousch and therapist Colleen Johnson. But she was "totally alienated" from her family in Las Vegas after confronting them with the sexual abuse perpetrated on her by her father. She said that she "felt like a zombie, like a robot sometimes[, and like she] just existed through the day" until her doctors changed her medicine so that she "didn't feel as drugged." But when asked about the effects of the changed prescriptions on her in 1996, she testified, "You didn't feel. You didn't feel joy. You just felt hurt. But you didn't feel joy. You didn't feel. You just—you didn't function. Sometimes I wouldn't cook. . . . I was tired a lot. [The medicine would] make you want to sleep." These effects occurred several months, lasting until near the end of 1996.

10

Theresa testified that in the first ten months of 1997, "[a] lot of yelling and fighting and screaming" was occurring in the home. She testified that she believed that she was under psychiatric care during this time and that she was on Lithium, Depakote, Neurontin, Zoloft, Effexor, Paxil, and Risperdal. She stated that as an effect of the medication, she did not smile and stopped laughing.

In the fall of 1997, Theresa and Royce both filed for divorce. Royce lived with his ex-wife briefly before returning home to Theresa around Halloween in 1997. After Royce and Theresa reconciled, they signed the first postnuptial agreement, as did their lawyers. Theresa remembered signing it. At that point, Theresa was seeing therapist Colleen Johnson several times a week because she and Royce were having severe problems at home. On cross-examination, Theresa testified that she saw her psychiatrist four times during the week that she and Royce signed the first postnuptial agreement, including November 10, 1997, the day before they signed it. She also testified that she saw her therapist on November 11, 1997, the same day and immediately before she and Royce signed the first postnuptial agreement and that Royce discussed the agreement with the therapist. Theresa admitted that she participated in the conversation "[a]s much as [she] could."

Theresa conceded on cross-examination that she was working some during the months of October, November, and December 1997; that she had her first checking account and credit card during that period and used them; that she

11

sometimes drove to the store and bought things; that she and Royce were both raising the children; and that she knew what was going on some of the time.

But she also testified that she was on and off her medication during this period, that sometimes she was "just numb," "a robot," "exist[ing]," and that she was "not in a good place" on November 11, 1997. Specifically, she "was very suicidal." Theresa testified on cross-examination that she was not in the hospital when she executed the first postnuptial agreement but that she "[s]hould have been."

Theresa stated that she was still taking her medicine at that time but that she could not discern any benefits from it. "They had to keep increasing it because it was getting worse and worse. The depression was back, and it was worse. And it was worse. It wouldn't ease up, not then."

In December 1997, about six weeks after she and Royce signed the first postnuptial agreement, Theresa tried to kill herself again. She stated that she was still taking her prescribed medication at that point but that it was still not helping. She described her life during the months of October through December of 1997: "We were going through a divorce. We were fighting. I wanted it to stop. I wanted the pain to stop. I wanted us to stop hurting each other. I wanted the fighting to stop. I wanted him to let me sleep at night."

After she tried to kill herself, Theresa was committed to Harris Methodist Springwood Hospital. Beal testified about the medical records from Springwood. The application for detention, prepared in part by Royce, provides, "[Theresa] fired

12

a gun in her bedroom attempting to kill herself. She has a history of mental illness and suicidal tendencies for about four years. She is also manic depressant." The exhibit shows that in the week preceding the shooting, Theresa had been on Prozac, Neurontin, Estrogen, Lithium, Lithobid, and a testosterone medicine.

Royce admitted that he might have told the police on the night of her suicide attempt that Theresa had a history of mental illness, and he admitted at trial to knowing that she was manic depressive at that point. He also admitted that the description—"she . . . was suicidal at times"—in the period before her December 1997 suicide attempt was "probably close."

Theresa testified that after her release from the hospital in January 1998, she was placed on a stronger dose of Risperdal for "psychotic episodes." After she left Springwood, she went to a "woman recovery place." She testified that she was so drugged that someone else had to drive her to the AA retreat that year.

In March 1998, Royce took Theresa to a Dallas psychiatrist. After three sessions, she stopped seeing that psychiatrist because Royce asked her to and because the company's insurance no longer covered "serious mental health." Theresa testified that she then "had to go to a different type of doctor that would treat [her] for depression and not bipolar. Because the insurance wouldn't pay." Royce admitted that he stopped her from going to the Dallas psychiatrist because each session cost him $150, and he did not want to pay the money.

In September 1998, Theresa had a bladder surgery. About four weeks later, she and Royce went to Las Vegas, where, according to Theresa, he raped her. She explained that they had agreed to try to have sex but to stop if it hurt her. It hurt, but, according to Theresa, Royce did not stop and "tore down the bladder surgery," causing bleeding. Royce testified that he stopped when she asked him to stop. At that point, she and Royce separated, and she filed for divorce again. She and her daughter moved into a hotel until approximately January 1999. Royce came to the hotel to see her "[a]lmost all the time," staying late but not spending the night.

During this time, Theresa was seeing another psychiatrist, Dr. Grant, and his associates. Theresa stated that her medicine was changed to Wellbutrin, Adderall, and Celexa. She testified that she took these medications until April or May 1999. On direct examination by her lawyer, Theresa stated that without telling her doctors, she took herself off Risperdal, which was part of her treatment for her bipolar condition, in April or May 1999 because she "was having trouble functioning at work, concentrating. [She] was starting to fall asleep at the board." (Theresa still worked for Royce's company at that time and for Royce (or one of his companies) as of the time of trial.) Theresa testified that Royce agreed that she was on too much medication.

When asked how the medicine affected her, she answered,

It would make me moody. Sometimes I would be temperamental. I couldn't concentrate all the time. If he was trying to tell me something, I would have to really focus hard at what he was telling me and trying

14

to listen, because I really want[ed] to hear what he was saying, and it was so cloudy.

Theresa testified that after she stopped taking Risperdal, she had more depression but fewer mood swings. On May 21, 1999, two months after she and Royce reconciled, they signed another postnuptial agreement, as did their lawyers. On cross-examination, she testified that as of that date, she was still taking Risperdal for psychotic episodes, that she had some psychotic episodes in May 1999, that she stopped taking Risperdal shortly after signing the agreement, and that she told the doctor that she had stopped taking it two weeks later. When asked on cross-examination whether she was in the hospital when the May 1999 postnuptial agreement was executed, Theresa answered that she was not but "[s]hould have been."

When Theresa signed the May 1999 postnuptial agreement, she was seeing Dr. Villarreal, one of Dr. Grant's associates, monthly, or more frequently if she needed it. She testified,

> I was educating myself about my disease. So if I—if I started feeling tired a lot, mood swings, noticing my temper was short, or I would pay attention to what Royce was saying or the kids were saying[, M]om, you're getting snappy, or [M]om, this or that. I would become more alert to what was going on. And then my own emotions. I started feeling feeling again. And I started understanding what I was feeling. And I knew when I was depressed. And I knew when I was suicidal. And I knew when a thought would run through my head. And I wanted it to stop.

15

She stated that she was having suicidal thoughts "[s]ometimes several times a week" during that time, that she continued to have them "[o]n and off throughout" 1999, that she had had them since 1995, and that she continued to have them at the time of trial. In September 1999, she began taking Clonazepam, which she understood would calm her down and eliminate the highs and lows, or cycling, that she was experiencing.

Beal testified that she saw Theresa from November 2000 until March 2002, from July 2003 through October 2003, and then again in March 2004 through the day of the trial on a monthly basis. Beal explained that she initially began treating one of Theresa's daughters in July 2000 for self-mutilation and drug use. Beal tried to persuade Theresa to meet with her over the next four to six months because "basically the daughter said [Theresa] was driving her crazy because of her mood swings and her anger and her disjointed thoughts and just her inability to function." Beal finally met with Theresa and Royce in November 2000 regarding the daughter and later, Theresa alone. In the initial interview, Beal "could tell that [Theresa] was very disjointed." Theresa's participation in the interview was "[i]llogical banter. . . . [Beal] just couldn't follow her. . . . It was very hard for [Beal] to understand [Theresa]." Beal was not treating Theresa at that point, so she could not diagnose her, but Beal "felt like [Theresa] was manic at the time" and "like she was very disjointed in her thinking." Beal explained,

16

She wouldn't finish one sentence without starting another topic. She would jump from one topic to another. She interrupted a lot and brought up things way in the past that didn't have a lot to do with what we were talking about at the time. And talked incessantly, and it was difficult to get her to stop because it wasn't—it wasn't necessarily having to do with what we talked about. I found her very difficult to understand. She wasn't helpful.

Beal testified that at another session in November,

[Theresa] went on for probably half of the session just—and finally I just told her that this was—that I felt like she was a major problem, and that her mental health—and I explained to her she looked manic. She was not thinking—you know, thinking clearly, and that she couldn't finish a sentence before another one.

Beal explained why she concluded that Theresa was manic:

She couldn't sit still. She was all around the office. She couldn't stop talking. Just on and on and on. Even when I tried to get her to sit down, she had trouble. She kept having to hold her hands. When she would sit, she would shake. And that's why she said she couldn't sit still. And her talking, incessant talking without a lot of clear thought.

Beal testified that when she discussed Theresa with Royce on November 5, 2000,

[He] referred to [Theresa's] obsessive compulsive diagnosis. Her anxiety being severe. That she was—had been drugging on speed were in quotes. Told me about her past drug use. That she was in a treatment center in New Mexico. That I needed to teach her boundaries. That she had no understanding of appropriate boundaries with people. That she would get in their face. That she would interrupt them. That she would do very inappropriate things.

He said that Theresa's constantly telling him I can't stand the abuse. I can't take the abuse. And he did not know what abuse she was referring to, felt like she was making that up. Royce states that wife is very unstable. I put that in parenthesis. And then he put—I asked how long, and he just said forever. He wanted me to get her—her meds stabilized and to get her head straightened out. And

17

said—he said—I put this in quotes, she can't function at all. And then I just have out beside it in quotes, crazy.

I asked him—he started telling me about some meds she had been on, even hormone medicine. I mean it was just—he just said she was on tons of medicine. That it didn't make sense. She would go from medicine to medicine, and not always take it regularly. I asked how long she had been on medicine, and he just said forever.

He said she hates me calling her crazy. He said she used to go to both AA and NA. He told her she might as well stop; that she's too unstable; it's not helping her; she didn't go regularly enough. That she was to the point where he would have to drive her places because she would get lost, and he didn't want to be taking her places like that.

She read her notes from the session into the record:

Royce states that wife is very unstable, in quotes, forever, in quotes, obsessive compulsive, Effexor and Celexa. He said the medicines she was on or had been on. Please get her meds and her head straightened out. She can't function. And then it's got at all, and in quotes later, crazy, just try to change her.

And then it says[,] ask Theresa about all of her psychiatrists. And then it has a list of meds. Hormone medicine, not detailed meds[;] it just says meds, Effexor, hormone medicine. Bipolar, question mark, because he didn't say it like he knew for sure. Was she manic, question mark. I asked the question how long had she been with all of these? And he said forever, but it sounded like an exaggeration.

A lot of this discussion was him—the two times I saw him, were exaggeration, negative about her health. I asked if she had ever been diagnosed? He said yes, but he didn't know the diagnosis. And the only other thing it says is she hates me calling her crazy.

Royce denied telling Beal that Theresa could not function at all and was crazy and denied telling Beal to get Theresa's medicine and head straightened out. He also denied calling Theresa crazy.

18

Theresa's attorney questioned Beal further about her notes about Royce:

Q.  Down at the bottom under where she hates him calling her crazy, there's some quotes.  And what does this say?

A.  It's about her going to the AA and NA meetings.  He said she used to go.  And he was just saying he told her to stop because she's too unstable.  She was having—he didn't want to have to drive her.  He didn't want to go.  I can't.  I don't want to.  He thought she should stop.  So—

. . . .

Q.  Okay.  And what plans did he say, though, he had to deal with; starting with outbursts?

A.  Okay.  Her problems.  Outbursts, forgetfulness, inability to process, mood swings, raging.  . . .

Beal testified that she agreed with Royce that Theresa was very unstable and very hard to deal with.  Beal also testified that Theresa was severely ill.

Initially, Theresa told Beal that she had been hospitalized three times in the past, had attempted suicide, and had been prescribed lots of medicine, but it was unclear to Beal what medicines Theresa was taking at that point and what her diagnoses were.  Theresa told her that she was taking Haldol, which Beal testified is a very strong antipsychotic drug, and Risperdal, which Beal testified was another antipsychotic drug, and that she had been taking them a long time.  Beal was concerned because usually the two antipsychotics are not prescribed simultaneously and also because Theresa did not realize that they were antipsychotic drugs.  Beal diagnosed Theresa with Bipolar I, which Beal testified is the severest form of the

19

disorder, anxiety-induced anorexia, and obsessive compulsive disorder.  Beal read

from her notes:

> My initial diagnosis of Theresa Sanders at this time, this is in the initial from seeing her, number one, bipolar disorder I; most recent episode, manic; severe without psychotic features. Two, ADHD inattentive type, with no hyperactivity.  Three, post-traumatic stress disorder.  Four, Obsessive Compulsive Disorder and possible anorexia nervosa caused from the bipolar and anxiety.  . . .

> I consider Ms. Sanders unable at that time when she was—I was seeing her to make any well thought out decisions logical or otherwise. Her thoughts were disjointed, as I found her unable to complete a thought without jumping to another topic or forgetting her thoughts in midsentence. [Theresa's daughter] stated her mom had been this way for a long time.  Ms. Sanders admitted to suicidal thoughts one week prior to our initial session, and approximately four suicide attempts in the past, and hospitalizations at Springwood Hospital, Allied Hospital, and in Santa Theresa, New Mexico.  . . .

Beal described Bipolar I:

> The main definition is flight of ideas, grandiose in that you often will think you're someone that you're not, or believe that things are happening that are not happening, disjointed thinking, not sleeping, or needing sleep for days and days and days, unproductive behavior repetitively, it's just unproductive, incessant talking.

> There are ten things that qualify for Bipolar I.  And, mainly, it's the severity of not needing sleep and the movement behavior, that anyone that sees her would think she was not well.

Beal referred Theresa to a psychiatrist, Dr. Minirth, and reviewed his notes:

> From Dr. Minirth's initial note, he diagnosed her with ADHD, OCD, hypomanic state at the time she was in session, and then a dash, bipolar, schizophrenic is what he put, that's the way he wrote it. Having . . . [f]lat affect.  He just described her behavior, which is usually what they do when they diagnose anybody with schizophrenia.  . . . That's what he diagnosed her with.

20

Beal defined schizophrenia:

> Schizophrenia is an isolation and inability to deal with people. An inability to, what we call, function in society in a normal—with a normal behavior where they can hold—retain thought, retain memory. Often they'll see things or hear things or be severely paranoid. I don't have the diagnosis in front of me with the details.

Beal testified that she wondered if Theresa was schizophrenic in her first visit because her mania was so severe and that she found over time that Theresa was schizophrenic. Beal also testified that bipolar disorder is thought to be genetic but that it usually manifests itself because of trauma or an ongoing stressor. She testified that schizophrenia is environmental in that certain trauma causes the central nervous system to not develop properly. She testified that schizophrenia and bipolar disorder both get worse if untreated. Beal testified that the sexual abuse that Theresa suffered at the hands of her father and "Uncle Mike" was a type of trauma that could lead to schizophrenia.

After beginning her treatment of Theresa and obtaining further medical history and records, Beal

> considered her being very unstable for a long time going untreated for a very long time. And the reason it got so severe, in my opinion, was because it was not treated consistently and had been going on, what seemed for like just from what I got from previous medical records and history, up to ten years before I saw her.
>
> I ordered records because that's what I'm supposed to do. And so it seemed like it had been going on a long time. And so I picked up my treatment with her to stabilize her on both medicine and for all of the things that she was diagnosed by me and the Minirth Clinic, combined, to work on each one to make her stable . . . .

21

The medical records Beal obtained included "lab reports, past psychiatrists['] and counselors[' records], follow-up with doctors and treatments from surgeries that she had, neurology reports, and diagnosis from various doctors." Beal had psychiatric reports from 1991 to 1995 as well as those from Dr. Minirth. The records showed that Theresa was diagnosed with bipolar disorder as early as 1993, when she was hospitalized after her first suicide attempt.

Theresa's trial counsel asked Beal to give an opinion about how long Theresa had been unable to make decisions:

Q. My question is: Based upon your review of the various medical records, psychiatric information that was provided to you, based upon, in your interviews or treatment of Ms. Sanders, do you have an opinion as to how long, from the information you have, that she was unable to make decisions?

A. From the medical records, I would say '93. From history and talking to her and looking through everything, my—medical records [are] factual. My opinion, because of the symptoms and the diagnosis, which resolve—which start with abuse or since she was a child, I don't factually know that. My job—and I can diagnose. That is my job. I can't see a client without diagnosing them if it's a true illness. I am a medical professional. My job is just to tell you what I saw from history and then during my time I saw her. But medically, '93, from the facts.

Beal testified that Theresa had taken antipsychotics, anti-anxiety, and bipolar medicines. The antipsychotics—Depakote, Zyprexa, Risperdal, and Haldol—would help Theresa think clearly and not hallucinate. Often, according to Beal, antipsychotics work quickly, within two days to two weeks. But the records Beal ordered showed that Theresa had been on and off them for years; Beal opined that

22

the frequent usage was to control Theresa's manic episodes. Beal also testified that people with bipolar disorder are never supposed to stop taking their medicine and that they "usually . . . get psychotic or severely depressed and suicidal" if they stop taking their prescribed medicine. She explained that if they get psychotic, then they have an inability to focus or function, have flights of ideas, are manic, do not sleep, and have more delusions.

Beal testified that Theresa did not stay on her prescribed medications, as reported by both Royce and Theresa. Beal testified that this circumstance would affect Theresa's ability to make rational decisions and was consistent with Beal's finding that Theresa was unable to make decisions.

On cross-examination, Beal testified that she believed that Theresa was competent on the day of Beal's testimony and admitted that she had no personal knowledge of Theresa's behavior before they met in November 2000. She also contrasted Theresa's behavior at trial and her behavior in November 2000. Beal testified that in her opinion, Theresa would not have been competent on May 15, 1999, a week before the second postnuptial agreement was signed, to sign a contract to buy a new car "[b]ecause for her to be as severe as she was when I met her, I don't think she could have been that way a year before." Beal explained that "[j]ust because you're bipolar doesn't mean you're incompetent. But from the knowledge [Beal] had of [Theresa] taking her medicine, and especially over the last year before [Beal] saw her, for her to be that severe, it had to be going on a long

23

time." Beal testified that she did not know whether Theresa could have balanced a checkbook in 1999 but that she thought not, based on her observations later in November 2000. Beal admitted that she did not "know as a fact" that Theresa was not in the same mental state on May 15, 1999 as she was that day at the trial but stated that she could only give her opinion. Beal also answered, "Yes" to Royce's trial counsel's question, "And do you think that she was just out of it each time she got married?"

Beal testified that she thought that Theresa should have been hospitalized in November 2000 and on other occasions and had suggested it then if no one would be able to stay with Theresa. Beal also testified that in November 2000, she did not believe that Theresa was competent to be driving in traffic. Beal also testified that by January 2001, she suggested that Theresa not engage in any business activity. When asked, "Is it your position with the court, ma'am, that prior to your treating this lady in—in the beginning of November of 2000, that she should not have been held responsible to the standard—to any standards prior to that time?", Beal answered,

> [T]here are certain things I think she would have been held responsible for. If she had hurt her children or anything like that, whether she was bipolar or manic or psychotic or any of that, I think she should have been held responsible. Do I think she was able to make any legal decisions or any banking decisions or anything like that, I don't think she would have known what she was doing very well.

Beal testified that she did not believe that Theresa should be held responsible for any legal decision from the time she became really sick, but she admitted that she

24

did not know exactly when Theresa became really sick. Beal testified that the medical records provided evidence that in May 1999, Theresa was not at least in the same mental condition she was at trial. Beal explained that the evidence would be "an inference from [Theresa's] abilities and the records in '97 and her abilities when [Beal] met her."

Beal also testified that Theresa was not on medication in 1999 and that she did not think that Theresa was treated at all in 1999 because Royce and Theresa both told her so. Beal testified that she did not believe that Theresa was making any healthy decisions in May 1999 and that Theresa required both medicine and treatment to get better.

Beal testified that Theresa stopped treatment in March 2002 and that Theresa told her that it was because of the cost. Theresa, who testified that she "started going a lot less" "[p]robably in 2001, approximately in March, maybe," verified that she stopped seeing Beal because of the expense, which was not covered by insurance. Theresa testified that she went back to see Beal on a few occasions but did not go back more often because she did not have the money.

Theresa also began seeing Dr. Minirth in late 2000 and saw him "[a]pproximately three months for stabilization." She testified that her drugs were then changed to Wellbutrin and "the new drugs." She admitted that she was again diagnosed as bipolar. Theresa stopped seeing Dr. Minirth "[p]robably [in] April" 2001 because the visits were not covered by her insurance and were therefore too

25

expensive.  After Dr. Minirth, Theresa went back to Dr. Villarreal.  He subsequently moved.  At the time of trial, she was seeing another doctor in his office on a monthly basis.

Beal admitted that she did not "exactly know" what Theresa's mental state was between March 2002 and July 2003, but stated that Theresa was "pretty severe" when she came back to treatment in 2003.

Royce's theme appeared to be that Theresa was lying regarding the effects of her mental illness on her mental capacity in 1997 and 1999.  On cross-examination, Theresa admitted to telling Royce soon after they first met that her baby daughter had died, which was a lie, and also admitted that he had given her money to bury the baby.  Theresa testified that the baby had needed "to be invisible."  After her own counsel objected, and Theresa continued to testify (which happened continually during this portion of the trial over the objections of both counsel), Theresa testified,

> I'm sorry.  I've got a problem when I'm looking at someone, I can't see.  I'm focused here right now, and I'm not seeing him when he stands up.  I hear him, but I don't see him stand up.
>
> . . . .
>
> When I'm focusing this way or like this.  When he stand up, it's like I don't see him over here stand up.
>
> . . . .

I can hear him when he talks. The same way when I was listening to Mr. King, I directly look at Mr. King. Because if I'm looking at you, I'm concentrating and I'm understanding what you're saying.

Theresa also testified on cross-examination that "it was the same way then [in 1997 and 1999]. I'm just like this then, but worse, a whole lot worse. Ask him. He knows."

When asked whether he believed that Theresa was "okay, mentally," from 1997 through 1999, Royce answered, "I don't know. Is she okay now?" To the follow-up question, "You don't know?" he answered, "I don't know. No, I don't know."

Initially, we reject Royce's argument that Beal's testimony is no evidence because it is speculative. Royce did not object to her testimony at trial on the basis of her qualifications as an expert, nor did he raise a pretrial challenge on that basis. Further, we note that Beal's opinions regarding Theresa were based on her review of medical records and her own personal knowledge. That all the records and eyewitness observations were not on the same dates that the postnuptial agreements were signed is of no moment; a factfinder may rely on circumstantial evidence including "preexisting external circumstances tending to produce a special mental condition" as well as evidence of "a mental condition from which its existence at the time in question may be inferred" to determine mental incapacity.[15]

Consequently, considering all the evidence and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to

---

[15] *... Bach*, 596 S.W.2d at 676; *Rowland*, 2010 WL 566881, at *2.

27

support the trial court's findings that Theresa involuntarily signed the agreements based on her mental incapacity and the trial court's conclusions that the postnuptial agreements were therefore not enforceable. We overrule Royce's second issue.

**Characterization of the Property**

In November 1979, more than fifteen years before his marriage to Theresa, Royce formed Euless Excavating, Inc., a closely held C-corporation. At the September 2007 trial, he was the sole owner of all the corporate stock, and he was and had always been the corporation's president. But he testified that the corporation had not been in active business for approximately three-and-a-half to four years.

In 1980, the corporation bought three commercial lots on S. Euless Main Street, Fort Worth, Texas. Royce testified that he paid $90,000 by check through the corporation for the lots. He further testified that the buildings on the land were built and paid for before his marriage. Theresa described the Property:

> Well, building A used to be Euless Excavating and Royce Sanders Trucking, Inc. Okay. And that consisted of two huge bays and a three-room office with a bathroom and things like that. And then it's got a hoist and everything out in the shop. It's got a huge backyard. A backyard, I mean fenced in area for the equipment that used to be. And it's rented out now.
>
> And then (unintelligible) is next door. They've got a huge—I think it's two bay. And I think most of them are done with like metal structures around them. And the front one is done also in metal. Now building D used to be Legend and (unintelligible) is now taking it over, too. And that's a concrete—that one's pretty new; 1990, I would say. And it's been kept in excellent condition. And the one in front. There's

28

actually four buildings. And then he's fenced in two areas that used to be car lots. Well, not really car lots, but storage for cars.

. . . .

. . . And it's got a huge driveway.

In August 2001, the corporation conveyed the Property to Royce. The deed, signed by Royce as the president of the corporation, recites that the Property was conveyed to Royce as his sole and separate property. At the time of the conveyance, Royce was the sole owner and stockholder of the corporation. He testified that at the time of the conveyance, the corporation was still doing some work but was going out of business, and he was looking forward to selling it at some point.

Royce testified that he did not pay anything to the corporation for the Property and that no transfer of cash or anything of value was made in exchange for the Property. He testified that he discussed with his accountant the tax advantages of the transaction. He explained that if he sold the Property individually, he could take advantage of the 15% capital gains tax rate. Otherwise, if the corporation sold the Property, then both the corporation and Royce would have to pay taxes, and Royce would pay taxes at his normal rate rather than at the more favorable capital gains rate. Royce still owned the Property at trial.

Note I to the corporation's financial statements of fiscal years ending September 30, 2000, and September 30, 2001, provides, however, that "[o]n September 30, 2001, the Company sold its land and buildings to Royce Sanders.

29

The sale price was $350,000 which resulted in a gain of $125,943." Royce testified that he did not know whether the corporation reported capital gains on the sale of the Property. He also testified that since the conveyance, he had received the rental income for the use of the Property. Respondent's Exhibit 31 includes the couple's joint 2006 income tax return, which lists as income the rental income from the Property as well as dividends from the corporation. The couple's joint income tax returns for tax years 2004 through 2006 also reflect depreciation deductions for the buildings, but Royce testified,

> I didn't depreciate anything. I've got a CPA that does that. I don't. I don't look at those books. I don't know how. I quit at the beginning of the tenth grade. I couldn't do it if I wanted to.

The corporation's 2005 income tax return reflects rental expense for the rent paid by the corporation to Royce.

Bryan Rice, a forensic accountant appointed by the court, testified that other than the corporation's tax return and financial statements for the year of the transaction, none of the financial records he received from the parties, which were incomplete, showed that the corporation had received money in exchange for the Property, that Royce had paid the corporation money for the Property, or that Royce signed a promissory note in exchange for the Property. Specifically, Rice admitted that he and his associates had "been provided with a great many bank statements and a great deal of information"—more than fifteen Bankers Boxes of documents—but stated that a lot of bank statements were missing. Rice stated that

30

he had reviewed documents pertaining to the conveyance of the Property from the corporation to Royce. Rice admitted that he had not seen where Royce had paid cash, written a check, or signed a promissory note in exchange for the Property, nor had he seen an influx of cash in that amount on the corporation's ledgers. But Rice pointed out that the corporation's tax return noted that there was a sale of land for $236,600 and a sale of improved property for $113,400. He also testified that the corporation recognized the gain on its income tax return. While Rice admitted that there was no evidence that any cash was paid or any note was given, he stated that the tax return was evidence that a transaction had occurred.

Rice also explained that he thought that avoiding potential double taxation was the main benefit of the transaction:

> If you—if you look at the totality of the situation, here's what I think the benefit was: I think the benefit of having this property on their 1040 was that the net rental income would be subject to tax on the 1040. If the property stayed in the corporation, it would have been—the net rental income would have been subject to tax at the corporate level. And if that net rental income would have ever been pushed out to Mr. and Ms. Sanders as a dividend, it would have been taxable again to them.

Theresa testified that early in 2001, Royce had discussed his plan to "buy the [Property], draw the rent, retire, [and] draw his Social Security." She testified that she knew that the Property was deeded to Royce. She also testified that she believed the property was worth $1.7 million.

31

Theresa challenges the trial court's findings that the corporation sold the Property to Royce as his sole and separate property, that community property funds were not used to purchase the Property, that the transaction was completed for tax purposes upon the advice of a CPA, and that no funds exchanged hands, and she also challenges the trial court's conclusion that the Property is Royce's separate property. She contends that the findings and the conclusion are not supported by the record.

Property owned by either spouse at the dissolution of the marriage is presumed to be community.[16] However, the community presumption is defeated by evidence that a spouse received property by deed reciting that the property was conveyed as the spouse's sole and separate property, and the property is then presumed to be separate.[17] Thereafter, the spouse contending that the property is community property has the burden to defeat the separate property presumption.[18] Additionally, separate property that merely undergoes mutations or changes in form remains separate property.[19]

---

[16] Tex. Fam. Code Ann. § 3.003(a) (Vernon 2006); *Todd v. Todd*, 173 S.W.3d 126, 127 (Tex. App.—Fort Worth 2005, pet. denied).

[17] *Kyles v. Kyles*, 832 S.W.2d 194, 196 (Tex. App.—Beaumont 1992, no writ) (citing *Hodge v. Ellis*, 154 Tex. 341, 277 S.W.2d 900, 904 (Tex. 1955)).

[18] *Id.*

[19] *Legrand-Brock v. Brock*, 246 S.W.3d 318, 321 (Tex. App.—Beaumont 2008, pet. denied); *Harris v. Harris*, 765 S.W.2d 798, 802 (Tex. App.—Houston [14th Dist.] 1989, writ denied).

The recital in the deed that the corporation conveyed the Property to Royce as his sole and separate property displaced the community presumption and created a new, rebuttable presumption that the Property is Royce's separate property.[20] Rice's testimony that the corporation recognized the gain after the transaction, Theresa's testimony that Royce had discussed "buying" the Property from his corporation, and the note appended to the corporation's financial statements indicating that a sale had occurred, as well as the evidence that Royce did not pay the nominal consideration of ten dollars recited in the deed, did not defeat the presumption that the Property is Royce's separate property, in light of the deed recital and the evidence that Royce did not pay anything of value to his corporation or sign a promissory note for the Property, that the transaction was completed for tax reasons on the advice of his accountant, and, significantly, that Royce wholly owned the corporation (and therefore ultimately, the Property) at the time of the conveyance as well as at the time of the divorce.[21] We note that the Property's becoming Royce's direct asset rather than his asset indirectly as an asset of his wholly owned

---

[20] *See Kyles*, 832 S.W.2d at 196.

[21] *See Fazakerly v. Fazakerly*, 996 S.W.2d 260, 266–67 (Tex. App.—Eastland 1999, pet. denied) (holding that wife overcame community presumption regarding leasing companies formed during marriage when evidence showed that she but not husband was named on stock certificates of the leasing companies and that they were formed to shield her separate property companies from liability, and no evidence showed that $1,000 payment was made from community funds).

corporation is a mere mutation of form that, under these facts, does not affect the Property's characterization.[22]

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's findings that the corporation sold the Property to Royce as his sole and separate property, that community property funds were not used to purchase the Property, that the transaction was completed for tax purposes upon the advice of a CPA, and that no funds exchanged hands, and we hold that the evidence is legally and factually sufficient to support the trial court's conclusion that the Property is Royce's separate property.

Theresa's further complaints about the trial court's finding and conclusion that she is entitled to a disproportionate award of the community estate and the conclusion that the trial court made a just and right division of the community estate rest solely on her argument that the Property is community. Because we have already held that the trial court properly concluded that the Property is Royce's separate property, we also reject these complaints. We overrule Theresa's issue.

---

[22] ... *See Legrand-Brock*, 246 S.W.3d at 321; *Harris*, 765 S.W.2d at 802.

34

**Conclusion**

Having overruled Royce and Theresa's issues, we affirm the trial court's judgment.


                                        LEE ANN DAUPHINOT
                                        JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

GARDNER, J. concurs and dissents without opinion.
WALKER, J. concurs without opinion.

DELIVERED:  October 14, 2010

35