

# NUMBER 13-09-00588-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**ROBERT MICHELENA,** **Appellant,**

**v.**

**MONICA MICHELENA,** **Appellee.**

**On appeal from the County Court at Law No. 2
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez**

This case involves the divorce of appellant/cross-appellee Robert Michelena from appellee/cross-appellant Monica Michelena. After a jury trial and several post-trial hearings, the trial court entered a decree of divorce dividing the couple's property and establishing custody for the couple's one minor child. By fifteen issues, Robert argues

that: the evidence did not support the jury's findings on various questions; the form in which certain questions were submitted to the jury was erroneous; the trial court erred in holding post-trial evidentiary hearings and entering various aspects of the divorce decree based on the evidence presented at those hearings; and the trial court erred in refusing to file findings of fact and conclusions of law. By six cross-issues, Monica challenges: various determinations by the jury and trial court concerning the characterization of certain marital property, the prenuptial agreement, and custody; the valuation of Monica's separate property; and the division of property as inequitably disproportionate. We affirm, in part, and reverse and remand, in part.

## I. Background

Robert and Monica were married in 1994. Prior to the marriage, the couple signed an "Agreement in Contemplation of Marriage," in which they agreed that "all income or revenue . . . from the parties' separate property, as designated in . . . Schedules A and B of this agreement, be and remain the separate property of the the party whose separate estate causes the income to be generated." Two documents were attached to the agreement: one document (which although not labeled, was clearly meant to be "Schedule A") purported to list Robert's separate property; the other document ("Schedule B") purported to list Monica's separate property.

In May 2005, stating that the marriage "has become insupportable because of discord or conflict of personalities . . . that destroys the legitimate ends of the marriage relationship and prevents any reasonable expectation of reconciliation," Monica

2

petitioned for divorce.   Robert counter-petitioned for divorce, citing the same grounds.[1]

In November 2006, the case was tried to a jury, which was questioned on: custody of Monica and Robert's one minor child; the amount of reimbursement, if any, owed to the community estate against Robert's house in McAllen, Texas; attorney's and ad litem's fees; the value of the community property and the separate property of each spouse; the characterization as community or separate of an heirloom engagement ring and two AG Edwards accounts; and the value of the ring and the AG Edwards accounts. The jury found that Robert and Monica should be appointed joint managing conservators and that Monica should have the "exclusive right to designate the primary residence of the child" "without regard to geographic location."   In response to the reimbursement question, the jury found that $25,000 was "the amount of the reimbursement claim . . . proved in favor of the community estate [of Robert and Monica] against [Robert]'s residence located [in] McAllen."   The jury awarded neither party any attorneys' fees and found that Robert and Monica were each responsible for fifty percent of the ad litem fees.   Jury questions nine through eleven involved the characterization and valuation of the community and separate property estates.   The jury valued the heirloom ring at $10,000; AG Edwards Account Number xxxx-5657-xxxx (AG Edwards #5657) at $74,000; and AG Edwards Account Number xxxx-5621-xxxx (AG Edwards #5621) at $130,000.[2]   The jury characterized the heirloom ring as 100% Monica's separate property; AG Edwards #5657 as 80% Robert's separate property and 20% community

---

[1] Monica also stated as grounds for divorce "cruel treatment [by Robert] . . . that renders further living together insupportable."

[2] The valuation of the ring and two AG Edwards accounts was included in jury question eleven.

property; and AG Edwards #5621 as 100% community property.[3] The jury then valued the community and separate estates as follows: $144,800 as community property; $10,000 as Monica's separate property; and $59,200 as Robert's separate property.[4]

After the jury trial and over the next couple of years, the trial court held a series of hearings dealing with various topics such as possession of the couple's child and the division of further community property that was not submitted to the jury for characterization and valuation. The divorce decree, which was entered on July 23, 2009, therefore embodied both the jury's verdict and various findings made by the court after trial concerning custody and the additional property.

The decree appointed Robert and Monica joint managing conservators of their child and ordered that Monica is the conservator with the right to designate and establish the child's primary residence without regard to geographic restriction. The decree set out Robert and Monica's rights and duties as joint managing conservators and entered possession orders for the child regarding weekends, spring break, summer, and holidays. The decree ordered Robert to pay child support and set out the parties' responsibilities regarding various aspects of child care such as educational and health care expenses and medical notification.

Next, the decree divided the property from what the court characterized as the "marital" estate. The decree awarded the following "marital" property to Monica: the jury's $25,000 reimbursement verdict; $72,400 as her portion of the community property verdict; personal property from the community estate valued at approximately $42,000; a

---

[3] The characterization of the property was included in jury question ten.

[4] The valuation of the community and separate estates was included in jury question nine.

4

$25,000 judgment as her portion of the community estate's personal property that was indicated to be sold[5]; and two Texas State Bank accounts, one International Bank of Commerce account, and two AG Edwards accounts, the values of which were not listed in the decree.[6]  The decree awarded the following "marital" property to Robert:  $72,400 as his portion of the jury's community property verdict; personal property from the community estate valued at approximately $170,000; the remainder of the personal property indicated to be sold, which was valued at $242,707.95 after subtracting the $25,000 judgment owed to Monica; two Texas State Bank accounts, the values of which were not listed in the decree; and all of the additional accounts listed in "Exhibit D" to the decree, the listed values for which accounts totaled approximately $516,000.[7]

The decree ordered that Robert and Monica were each fifty percent responsible for the community estate's approximate $20,000 debt; the decree further ordered that Robert was to reimburse Monica $968 for medical expenses incurred during the divorce and was responsible for the balance due on the 2004 F-250 truck he was awarded as part of his portion of the community property.  Finally, the decree confirmed the jury's verdict on the

---

[5] The property to be sold was listed in "Exhibit C" to the decree and was valued at $267,707.95.

[6] The "marital" property awarded to Monica, with values ascertainable by the decree, totaled approximately $164,000.

[7] The value we state for Exhibit D represents the total for those accounts with definite amounts included in the exhibit.  In addition, Exhibit D listed seven accounts with "pending value[s]."  We did not include these values in our approximate total for Exhibit D.  As discussed further in the opinion, it appears from the testimony and evidence that some of accounts listed in Exhibit D are closed; are not owned by Robert and Monica but rather by other family members; or are merely alternate account numbers for accounts covered by the prenuptial agreement or accounts submitted to the jury for characterization and valuation.

The decree also awarded Robert the real property in McAllen, Texas, which the decree characterized as "marital" property and the value of which was not included in the decree.  However, the parties appear to agree that the house and acreage at this address was Robert's separate property.

The "marital" property awarded to Robert, with values ascertainable by the decree, totaled approximately $1,001,000.

couples' separate property, awarding Monica $10,000 and Robert $59,200 pursuant to jury questions nine, ten, and eleven.

Robert requested that the trial court file findings of fact and conclusions of law, which the trial court did not do. Both Robert and Monica filed motions for new trial, which were overruled by operation of law. This appeal followed.

## II. Submission of Reimbursement Question to Jury

By his fourth issue, Robert argues that the trial court erred in submitting question five to the jury, which asked the jury to "[s]tate in dollars the amount of the reimbursement claim, if any proved in favor of the community estate." (Emphasis omitted.) Robert argues that because Monica did not plead a claim for reimbursement, the trial court erred in questioning the jury on this theory.

We review the trial court's submission of jury questions for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). The trial court's discretion is subject only to the requirement that the question must control the disposition of the case, be raised by the pleadings and the evidence, and properly submit the disputed issues for the jury's determination. *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002); *see* TEX. R. CIV. P. 278.

A claim for reimbursement involves the community estate being reimbursed for the value of time and effort expended by either spouse to enhance the separate estate of either. *See Jensen v. Jensen*, 665 S.W.3d 107, 109 (Tex. 1984); *see also generally* TEX. FAM. CODE ANN. § 3.402 (West Supp. 2011). In the "Division of Community Property" portion of her petition for divorce, Monica states that she "should be awarded a

6

disproportionate share of the parties['] estate" for, among other reasons, the "[i]ncrease in value of separate property through community efforts by time, talent, labor and effort."

> While Rule 278 requires that, for a party to obtain a requested jury instruction, there must be both pleadings and evidence to support the instruction, [] the rule does not mean that the pleading must be exact or perfect. A pleading should contain a short statement of the cause of action sufficient to give fair notice of the claim involved . . . . In the absence of special exceptions, the petition is construed liberally in favor of the pleader. Courts should uphold the petition as to a cause of action if it can be reasonably inferred from what is specifically stated . . . .

*Gutierrez v. People's Mgmt. of Tex. I, Ltd.*, 277 S.W.3d 72, 79 (Tex. App.—El Paso 2009, pet. denied) (internal citations and quotations omitted). Monica's pleadings, which referenced the benefit to Robert's separate property of her "time, talent, labor and effort," were sufficient to give fair notice of her reimbursement claim. Because Robert did not file special exceptions, the trial court was allowed to liberally construe Monica's pleadings, and it did not abuse its discretion in submitting a question to the jury on reimbursement. Robert's fourth issue is overruled.

### III. Evidence of Reimbursement

By his second, third, and fifth issues, Robert challenges the evidence supporting the jury's answer to question five on reimbursement. Robert argues that Monica presented no evidence at trial regarding any increase to the value of Robert's house as a result of her "time, talent, labor, and effort." He further argues that the evidence relevant to reimbursement admitted at trial showed only that Monica engaged in normal maintenance and upkeep of the house, which would not support a claim for reimbursement. For these reasons, Robert argues that the evidence supporting the $25,000 reimbursement to the community estate was both legally and factually

7

insufficient and that the trial court erred in including the reimbursement in the divorce decree.

## A.  Standard of Review

The party complaining of the trial court's division of property must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion.  *Pletcher v. Goetz*, 9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied) (op. on reh'g).  Under an abuse of discretion standard, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion. *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).  They are not independent grounds of error.  *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.); *Crawford v. Hope*, 898 S.W.2d 937, 940 (Tex. App.—Amarillo 1995, writ denied). If there is any reasonable basis for doing so, we must presume that the trial court exercised its discretion properly.  *Pletcher*, 9 S.W.3d at 446.  We will not disturb the trial court's division unless the record demonstrates "that the division was clearly the result of an abuse of discretion."  *Id.*  That is, we will not reverse the case unless the record clearly shows that the trial court was acting arbitrarily or unreasonably and that the trial court's error materially affected the just and right division of the estate.  *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985); *Chavez v. Chavez*, 269 S.W.3d 763, 766 (Tex. App.—Dallas 2008, no pet.).

When an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, the appellant must demonstrate that there is no evidence to support the adverse finding.  *City of Keller v. Wilson*, 168 S.W.3d 802,

8

810 (Tex. 2005); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Such a no-evidence challenge will be sustained only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller*, 168 S.W.3d at 810; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). In conducting a legal sufficiency review, we review the evidence presented at trial in the light most favorable to the jury's verdict and indulge every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010); *City of Keller*, 168 S.W.3d at 822, 827.

In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469-70 (Tex. App.—Corpus Christi 2008, pet. denied); *Bay, Inc. v. Ramos*, 139 S.W.3d 322, 329 (Tex. App.—San Antonio 2004, pet. denied) (en banc). In a factual-sufficiency challenge, we must examine both the evidence supporting and that contrary to the judgment. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445

9

(Tex. 1989). Additionally, the jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## B. Applicable Law

"A right of reimbursement arises when the funds or assets of one estate are used to benefit and enhance another estate without itself receiving some benefit." *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982) (citation omitted). "[I]t also arises when community time, talent and labor are utilized to benefit and enhance a spouse's separate estate, beyond whatever care, attention, and expenditure are necessary for the proper maintenance and preservation of the separate estate, without the community receiving adequate compensation." *Id.* The party claiming reimbursement bears the burden of establishing the net benefit to the payee estate. *Id.*

Reimbursement includes "capital improvements to property other than by incurring debt." TEX. FAM. CODE ANN. § 3.402(a)(8) (West Supp. 2011). "Reimbursement for funds expended by a marital estate for improvements to another marital estate shall be measured by the enhancement in value to the benefited marital estate." *Id.* § 3.402(d). The enhanced value of the separate property is determined by the difference between the fair market value before and after any improvements made by the community during the marriage." *Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex. 1985). The enhancement value is not determined by the actual costs expended by the community estate. *Zeptner v. Zeptner*, 111 S.W.3d 727, 737 (Tex. App.—Fort Worth 2003, no pet.) (citing *Anderson*,

10

684 S.W.2d at 675) (other citations omitted).

## C. Analysis

At trial, Monica testified that when she and Robert moved into Robert's house shortly after the beginning of their marriage, the house was essentially a hunting cabin or lodge. She then described in detail the efforts she made during the marriage to improve the house, including renovating the kitchen, bathrooms, bedroom, and living room. In connection with those improvements, Monica admitted into evidence various receipts from furniture stores and other retailers detailing items she had purchased for the house, including couches, beds, dining room furniture, and playground equipment.

However, having reviewed the record, we find no testimony or other evidence at trial about the value of the house either before or after the improvements made by Monica. And it is the enhancement to the value of the house, not the costs paid by the community estate, that are the relevant and proper measurement of a reimbursement claim. *See id.*; *see also Vickery*, 999 S.W.2d at 371. In other words, although Monica gave detailed descriptions of the improvements she made to Robert's house, her testimony and the receipts she admitted were, alone, insufficient evidence of the difference in market value of the house before and after the improvements, and without evidence of any increase in value, there was a complete absence of evidence of a vital fact necessary to the reimbursement claim. *See City of Keller*, 168 S.W.3d at 810; *King Ranch, Inc.*, 118 S.W.3d at 751. In short, Monica did not meet her burden to establish the benefit of the community's efforts to Robert's separate estate. *See Vallone*, 644 S.W.2d at 459. Thus, even viewing the evidence in the light most favorable to the verdict

11

and indulging every reasonable inference in favor of it, we still cannot conclude the jury's $25,000 reimbursement verdict was supported by legally sufficient evidence as there was simply no evidence at trial supporting that dollar amount. *Del Lago Partners, Inc.*, 307 S.W.3d at 770; *City of Keller*, 168 S.W.3d at 822, 827. And because the reimbursement claim was not supported by legally sufficient evidence, the trial court erred in awarding Monica the reimbursement verdict in the divorce decree. This $25,000 award to Monica materially affected the just and right division of the estate, and as such, the trial court's error was a clear abuse of discretion. *See Pletcher*, 9 S.W.3d at 446; *see also Chavez*, 269 S.W.3d at 766. Robert's second, third, and fifth issues are sustained.[8]

## IV. Characterization and Valuation of Stock Accounts

By his tenth, eleventh, and twelfth issues,[9] Robert argues that the trial court erred in entering judgment on the jury's answers to questions ten and eleven, which asked the jury to characterize two AG Edwards stock accounts as community or separate property and assign a dollar value to the accounts, respectively. By these issues, Robert argues both that the evidence was insufficient to support the jury's answers to questions ten and eleven and that "it was improper and error for the [trial court] to enter [into the divorce decree the] monetary amounts" awarded by the jury "instead of percentage values."

In its answer to question ten, the jury characterized the first AG Edwards account—AG Edwards #5657—as eighty percent Robert's separate property and twenty percent community property; the jury characterized the second AG Edwards

---

[8] Having sustained Robert's second, third, and fifth issues on the basis of legally insufficient evidence of enhancement to value, we need address neither his argument that the evidence was factually insufficient nor his argument that Monica's efforts in improving the house amounted only to normal maintenance and upkeep. *See* TEX. R. APP. P. 47.1.

[9] In his original brief, these issues were Robert's eleventh, thirteenth, and fifteenth issues.

12

account—AG Edwards #5621—as one-hundred percent community property. In its answer to question eleven, the jury valued AG Edwards #5657 at $74,000, and the jury valued AG Edwards #5621 at $130,000.

As to Robert's argument that the jury's answer to question ten is supported by insufficient evidence, he provides no legal authority regarding the characterization of property in a divorce, record citations, or substantive analysis applying the law to the facts of this case. As such, this argument is inadequately briefed and waived. *See* TEX. R. APP. P. 38.1(i); *Graves v. Tomlinson*, 329 S.W.3d 128, 162 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

As to Robert's argument that the jury's answer to question eleven is supported by insufficient evidence, we have reviewed the relevant evidence presented at trial. Financial statements for the two accounts were admitted at trial as evidence. The statement for AG Edwards #5657 showed a current value of $63,134.32; the statement showed the initial cost for opening the account to be $73,981.93. The statement for AG Edwards #5621 showed a current value of $156,173.60; the statement showed the initial cost for opening the account to be $129,952.12. Based on the foregoing, there was clearly a basis in the evidence for the jury's verdict. The jury could have reasonably assigned a value of $74,000 to the AG Edwards #5657 account based on the costs expended by the parties in opening the account. Likewise, the jury could have reasonably assigned a value of $130,000 to AG Edwards #5621 based on the costs expended in opening that account. We therefore conclude that the evidence was sufficient to support the jury's answer to question eleven.

13

Robert's final argument is that the trial court erred in incorporating the jury's answer to question eleven into the divorce decree because the accounts are stock accounts with fluctuating values and, therefore, it was error to enter monetary amounts as opposed to percentage values. In support of this argument, Robert cites this Court's opinion in *May v. May*, 716 S.W.2d 705 (Tex. App.—Corpus Christi 1986, no writ). But having reviewed *May*, we cannot conclude it stands for the proposition Robert implies it does. In *May*, we reviewed the trial court's division of a husband's retirement account upon divorce from his wife. *Id.* at 706. The Court engaged in a complicated analysis of the mathematics used as the "proper method of dividing future interests in retirement benefits." *Id.* at 707-11. *May* does not apply to the facts of this case; it is an analysis specific to the division of retirement benefits. In other words, *May* does not stand for the proposition that a divorce decree may only contain percentage ownership values for stock accounts, and in our research, we have found no other law standing for this proposition. We are therefore not persuaded by Robert's argument in this regard.

In sum, we conclude that the evidence was sufficient to support the dollar amounts assigned to the stock accounts by the jury and that the trial court did not err in entering those dollar amounts into the divorce decree. Robert's tenth, eleventh, and twelfth issues are overruled.

### V. Submission of Jury Question Nine

By his eighth issue, Robert argues that the trial court erred in submitting question nine to the jury because it differed from the applicable pattern jury charge. Question nine and the jury's answers to the question follow:

14

State in dollars the value of each of the following items:

PROPERTY VALUE

(Community Property, if any, MONICA MICHELENA AND ROBERT MICHELENA)

$ \_\_\_144,800\_\_\_

PROPERTY (Separate Property, if any, of MONICA MICHELENA

$ \_\_10,000\_\_\_

PROPERTY (Separate Property, if any, of ROBERT MICHELENA)

$ \_\_59,200\_\_\_

Texas Rule of Civil Procedure 278 provides that the trial court's "[f]ailure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment . . . ." TEX. R. CIV. P. 278. Here, at the charge conference, although counsel for Robert objected to question nine and requested that it conform to the relevant pattern jury charge, counsel never tendered her proposed question to the trial court in writing. Without doing so, Robert has waived any error by the trial court in submitting question nine, as worded, to the jury. *See id.*; *see also Gerdes v. Kennamer*, 155 S.W.3d 523, 534-35 (Tex. App.—Corpus Christi 2004, pet. denied). Robert's eighth issue is overruled.

## VI. Determinations Made After Jury Trial

By his thirteenth, fourteenth, and fifteenth issues,[10] Robert argues that the trial court erred in holding post-trial hearings in which it heard evidence related to certain

---

[10] In his original brief, these issues were Robert's sixteenth, seventeenth, and nineteenth issues.

property not considered for division at the jury trial. Citing *Goetz v. Goetz*, Robert appears to argue that the division of the couple's property was the sole province of the jury, and the trial court therefore erred in considering the post-trial evidence and entering various portions of the divorce decree based on that evidence. *See* 534 S.W.2d 716, 718 (Tex. Civ. App.—Dallas 1976, no writ). Monica responds that it became apparent after trial that a substantial amount of property possessed by the couple had not been disclosed by Robert prior to trial.[11] Monica responds that because Robert did not request that this property be submitted to the jury for characterization as community or separate or for valuation, he has waived his right to complain of the trial court's characterization, valuation, and division of the property without the jury. Monica then asserts that the trial court acted within its discretion to determine post-trial that the property was community property and divide it in a just and right manner. We agree with Monica.

As Robert posits, it is generally true that all disputed fact issues in a divorce case must be submitted to a jury where, as was the case here, a jury is timely demanded. *See id.* (citations omitted). But it is also true that the "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property" unless proven otherwise by "clear and convincing evidence." TEX. FAM. CODE ANN. § 3.003(a)-(b) (West 2006). And the party attempting to rebut the community-property presumption has the burden of seeking the necessary jury questions regarding the characterization of the marital property. *In re Marriage of Moore*, 890 S.W.2d 821, 834 (Tex. App.—Amarillo 1994, no writ) (citing *W.O. Bankston Nissan, Inc. v. Walters*, 754

---

[11] This fact is not disputed by Robert and is supported by the record. *See* TEX. R. APP. P. 38.1(g).

S.W.2d 127, 128 (Tex. 1988); *Horlock v. Horlock*, 614 S.W.2d 478, 480 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.)). If the party fails to seek such questions on the disputed property, he waives any error committed by the trial court in characterizing that property. *See id.*; *see also* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or defense not conclusively established under the evidence and *no element of which is submitted or requested* are waived." (Emphasis added.)).

Here, it is undisputed that Robert did not request jury instructions regarding the property at issue in his thirteenth through fifteenth issues. It matters not that the property was not disclosed until after trial. As discussed above, all property possessed by either spouse during the marriage is subject to the community-property presumption. Robert was obliged to submit that property to the jury for characterization, if he so desired, and his failure to do so waived our review of his complaints regarding the trial court's post-trial determinations regarding the undisclosed property. As such, we overrule his thirteenth through fifteenth issues to the extent they complain of the foregoing determinations by the trial court.

## VII.   Findings of Fact and Conclusions of Law

By his first issue, Robert argues that the trial court erred in refusing to file findings of fact and conclusions of law, as were requested by Robert, regarding the court's rulings in the divorce decree. *See* TEX. R. CIV. P. 296, 297. Assuming without deciding that the trial court so erred, Robert has not explained to this Court how he was harmed by the trial court's failure to file findings and conclusions. When there are "multiple grounds for

17

recovery or multiple defenses" in a case, "an appellant [is] harmed" by the trial court's failure to file findings and conclusions because he is put "in the position of having to guess the trial court's reasons for rendering judgment against him." *Liberty Mut. Fire Ins. v. Laca*, 243 S.W.3d 791, 794 (Tex. App.—El Paso 2007, no pet.) (citations omitted). In several of his issues related to determinations made by the trial court after trial, Robert makes an almost identical conclusory statement that because of the trial court's "refus[al] to file findings of fact and conclusions of law," he "has been harmed and cannot ascertain the reasons for the ruling." Aside from those singular, conclusory statements, however, Robert does not explain how those rulings were based on multiple grounds for recovery or otherwise identify the reason why we should presume the sort of harm he alleges. *See* Tex. R. App. P. 38.1(i); *Liberty Mut. Fire Ins.*, 243 S.W.3d at 794. In short, we are not persuaded by Robert's brief that he was harmed by the trial court's refusal to file findings and conclusions. Robert's first issue is overruled.

## VIII. Remaining Issues

While we are bound to liberally construe an appellant's brief and address his issues if possible and practicable, *see* Tex. R. App. P. 38.9, where a brief almost completely fails to cite the appellate record or any relevant legal authority and presents no substantive argument, the appellate court is not obligated to make a party's argument for him.[12] *See Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 427 (Tex. 2004); *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston

---

[12] On October 3, 2011, the Court notified both parties that their briefs did not substantially comply with Texas Rule of Appellate Procedure 38.1 and directed the parties to file amended briefs in the case that complied with the briefing rules. *See* Tex. R. App. P. 38.1(i). Robert filed his amended brief on December 21, 2011, but three of Robert's appellate issues remain inadequately briefed.

[14th Dist.] 2008, no pet.); *see also Johnson v. City of Dallas*, No. 05-09-00365-CV, 2010 WL 2491024, at *1 (Tex. App.—Dallas June 22, 2010, no pet.) (mem. op.) ("Although we must interpret this requirement [Texas Rule of Appellate Procedure 38.1(i)] liberally, an issue not supported by authority is waived.") (citation omitted). Indeed, such a course is discouraged as it is prohibited that we act as advocates for the interests of the parties. *See Canton-Carter*, 271 S.W.3d at 931 (citing *Martinez v. El Paso County*, 218 S.W.3d 841, 844 (Tex. App.—El Paso 2007, pet. stricken)) (holding that an appellate court should not speculate as to an appellant's argument and thus stray from its role "as a neutral adjudicator [to] become an advocate for [an appellant]"). When a party fails to adequately brief an issue, he waives our review on appeal. *See* TEX. R. APP. P. 38.1(i); *Graves v. Tomlinson*, 329 S.W.3d 128, 162 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

In his sixth issue, Robert asserts that the trial court erred in entering judgment that awarded the entire amount of the reimbursement claim (jury question five) to Monica. However, Robert cites to no legal authority in support of this assertion, and his argument in support of this issue consists of two to three conclusory sentences with no substantive analysis. In his seventh and ninth issues, Robert appears to challenge the evidence supporting the jury's answers to questions nine and ten, respectively, which involved the valuation of the couple's separate and community property estates and the characterization of certain property as community or separate. But Robert does not provide the applicable standard of review or any substantive law on the characterization or valuation of property in a divorce case. And, again, his argument in support of these

issues consists of two or three cursory and conclusory statements. *See* TEX. R. APP. P. 38.1(i). Absent meaningful legal analysis supported by authority and record cites, we will not engage in a time-consuming review of the voluminous ten-day trial record in this case in order to address the merits of these issues. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 283 (Tex. 1994) (holding that it has never been a part of an appellate court's duties to search the record for evidence itself). These issues are therefore inadequately briefed and waived. *See* TEX. R. APP. P. 38.1(i). We overrule Robert's sixth, seventh, and ninth issues.

## IX.  The Cross-Appeal

By six cross-issues, Monica challenges various aspect of the divorce decree, including the characterization, valuation, and division of the marital property and the custody orders.

## A.  Characterization of Property

By two issues, Monica challenges the characterization of certain property as separate rather than community property.

As stated previously, property possessed by either spouse during the marriage is presumed to be community property unless that presumption is overcome by clear and convincing evidence that the property in question is the separate property of one spouse. *See* TEX. FAM. CODE ANN. § 3.003(a)-(b).

> In order to rebut the community property presumption, the party claiming separate property must trace and identify the property claimed as separate property by clear and convincing evidence. Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. Separate property will retain its character through a series of

20

exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character.

*Walton v. Johnson*, 879 S.W.2d 942, 946 (Tex. App.—Tyler 1994, writ denied); *see also*

*Vandiver v. Vandiver*, 4 S.W.3d 300, 302 (Tex. App.—Corpus Christi 1999, pet. denied)

("To [rebut the community property presumption], the spouse must trace and clearly

identify the property claimed as separate property.") (citations omitted). If the trial court

does mischaracterize property in its division of the marital estate, the error does not

require reversal "unless the mischaracterization would have had more than a de minimis

effect on the [] court's just and right division of the property." *Vandiver*, 4 S.W.3d at 302

(citations omitted).

### 1. Texas State Bank Accounts

By her first cross-issue, Monica argues that the trial court abused its discretion in

determining that three Texas State Bank accounts—one with an account number ending

in 602, one with an account number ending in 694, and one with a certificate of deposit

number ending in 549—were Robert's separate property because Robert failed to

overcome the presumption that the accounts were community property by clear and

convincing evidence.[13] The trial court determined that the evidence showed that the 602

account and the 549 certificate of deposit consisted of funds directly traceable to bank

accounts or other properties listed in the prenuptial agreement; granted Robert's motion

for directed verdict on those accounts; and, therefore, did not submit those accounts to

---

[13] It is undisputed that Robert was in possession of the three accounts during the marriage. At the time of the divorce, the number 602 account had a balance of $498,366.21; the number 549 certificate of deposit had a balance of $100,000; and the balance of the number 694 account was unknown.

the jury for characterization and valuation.[14] Monica contends that there was insufficient evidence tracing the funds in these accounts to the prenuptial accounts and properties, and as such, the trial court erred in characterizing the accounts as Robert's separate property. We construe Monica's first cross-issue as a challenge to the trial court's granting of Robert's motion for directed verdict.

"It is error to grant a directed verdict when the evidence raises any issue of material fact." *Connell v. Connell*, 889 S.W.2d 534, 538 (Tex. App.—San Antonio 1994, pet. denied) (citing *Garza v. Maverick Mkt., Inc.*, 768 S.W.2d 273, 276 (Tex. 1989)). In reviewing the granting of a directed verdict, we indulge every reasonable inference in favor of the proponent of the evidence and discard all contradictory evidence. *Id.* at 538-39 (citing *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983)). "If so viewed, the evidence amounts to more than a scintilla, i.e., more than a mere suspicion or speculation that the fact proposition might be true, then an issue is raised." *Id.* But when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and it will not support a verdict or judgment. *Id.* (citing *Seideneck v. Cal Bayreuther Assoc.*, 451 S.W.2d 752 (Tex. 1970); *Tex. City Terminal Ry. v. McLemore*, 225 S.W.2d 1007, 1009 (Tex. Civ. App.—Galveston 1949, writ ref'd n.r.e.)). In other

---

[14] As to the number 694 account, in particular, there was evidence at trial that the account belonged to Robert's mother. Robert testified that he was listed on the account but that he never deposited or withdrew money from the account or otherwise assisted his mother with her finances. Robert testified that his mother listed him on the account because she is a widow and "she just wants that in case anything happens" to her. This characterization of the number 694 account was not contested by Monica at trial, and she presented no evidence that the 694 account was either Robert's separate property or the couple's community property. We conclude that Robert's testimony at trial, which was never contradicted by Monica, established that the number 694 account was an account owned by his mother—it was neither his separate property nor the property of the marital estate. Thus, we cannot conclude that the trial court erred in determining that the 694 account should not be submitted to the jury for characterization.

words, an instructed verdict is proper in two instances: when there is no evidence or when the evidence has no probative value or force. *Id.*

Here, Robert points us to evidence at trial linking the funds in the 602 account and the 549 certificate of deposit to the accounts and properties included in the prenuptial agreement. First, as to the number 602 account, there was evidence at trial that Robert and his family sold two trailer parks—El Valle De Sol and Manlorsons Estates—in 1999. Both parks were included in the prenuptial agreement as Robert's separate property. Robert's share from the sale of the trailer parks totaled somewhat less than $500,000. Robert's testimony at trial then indicated that the funds in the 602 account were generated by his proceeds from the sale of the trailer parks.

Second, as to the number 549 certificate of deposit, Robert testified at trial that it was generated from funds in a First State Bank and Trust money market account listed in the prenuptial agreement. Robert testified that he opened the First State Bank money market account in 1981 but, at some point, Texas State Bank acquired First State Bank. Robert testified that the money market account stayed the same after the acquisition, except that Texas State Bank added a digit to the account number. Robert then opened the number 549 certificate of deposit with funds from the money market account. Robert testified that no money has been withdrawn from the certificate of deposit since it was opened. We find no evidence in the record that the 549 certificate of deposit was community property.

As to the number 602 account, in particular, Monica points us to evidence from trial that community funds were commingled with the number 602 account. *See Irvin v.*

23

*Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.) (citation omitted) ("[I]f the evidence shows that separate and community property have become so commingled as to defy re[-]segregation and identification, the community presumption prevails."). First, Monica points us to evidence—namely, a series of cleared checks—that she deposited community funds in the 602 account. Second, Monica points us to evidence that Robert took out a $40,000 loan during the marriage that he deposited into the 602 account; the record includes bank documents and testimony by Robert substantiating this fact, as well. Because any loan taken out during the marriage is presumed to be community property, Robert commingled community funds with the 602 account when he deposited the loan into that account. *See* TEX. FAM. CODE ANN. § 3.003(a)-(b). Finally, Monica points us to testimony by herself and Robert that Robert deposited wages from various jobs he held during the marriage into the 602 account.

Based on the foregoing testimony and evidence, we conclude that Robert adequately traced the 549 certificate of deposit to a money market account that was included in the prenuptial agreement. There is no evidence in the record that the 549 certificate of deposit was community property, and we believe Robert showed by clear and convincing evidence how he originally obtained the property and how the property retained its separate character throughout a series of exchanges during the marriage. *See Walton*, 879 S.W.2d at 946; *Vandiver*, 4 S.W.3d at 302. There was no fact issue as to the characterization of the 549 certificate of deposit, and thus, we cannot conclude that the trial court erred in concluding that this account was Robert's separate property, granting Robert's directed verdict as to this account, and refusing to submit this account

24

to the jury. *See Connell*, 889 S.W.2d at 538-39. Monica's first cross-issue is overruled as to the 549 certificate of deposit.

But with regard to the number 602 account, although there was evidence at trial that the funds in the account originated from the sale of property listed in the prenuptial agreement, we believe the record contains more than a scintilla of evidence that community funds were commingled with the account, as well. *See id.*; *see also Irvin*, 139 S.W.3d at 708. As such, the evidence created a fact issue as to whether the number 602 account retained its separate character, and the trial court erred in granting Robert's directed verdict as to this account and not submitting the account to the jury for characterization. *See Irvin*, 139 S.W.3d at 708; *see also Connell*, 889 S.W.2d at 538-39. Monica's first cross-issue is sustained as to the number 602 account.

### 2. AG Edwards Accounts

By her second cross-issue, Monica challenges the portion of the decree finding that $144,800 was community property and $59,200 was Robert's separate property, arguing that Robert failed to overcome the presumption that the entire amounts in the two AG Edwards accounts submitted to the jury were community property by tracing the amounts to his separate property. Monica argues that, as a result, the jury's valuation of the community property estate at $144,800 was against the great weight and preponderance of the evidence.

Before beginning our analysis, we note that AG Edwards #5621, first discussed above in Part V of this opinion, was determined by the jury to be 100 percent community property and its entire amount ($130,000) was included in the jury's community property

25

valuation. As such, although Monica's second issue generally challenges the jury's answers as to both accounts, we cannot construe the issue as complaining of the verdict as to the #5621 account. Rather, the relevant determination here seems to be the jury's valuation of Robert's separate estate at $59,200, which represents eighty percent of the value of the #5657 account, and the remainder of the community estate at $14,800, which represents twenty percent of the #5657 account. We also note that by phrasing her challenge as one concerning the "great weight and preponderance" of the evidence, Monica appears to challenge the factual sufficiency of the evidence, and we will treat this issue as such.

Under the heightened clear and convincing evidence standard of review applicable to this issue, when an appellate court conducts a factual sufficiency review of a separate property finding in a divorce proceeding, the court must conclude that the evidence is factually insufficient if the court determines that no reasonable fact finder could form a firm belief or conviction of the truth of its finding. *See Stavinoha v. Stavinoha*, 126 S.W.3d 604, 609 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *In re J.F.C.*, 96 S.W.3d 256, 266-67 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). And if the reviewing court determines that the evidence is factually insufficient, the court must detail why it has reached this conclusion. *Id.*

It is undisputed that Robert was in possession of AG Edwards #5657 during the marriage. In Part IV of this opinion, we determined that the $74,000 value assigned to the #5657 account by the jury was supported by the evidence and reasonable. In support of her second cross-issue, Monica asserts that the only evidence at trial that AG

26

Edwards #5657 was Robert's separate property was his testimony that he deposited several checks from the number 602 Texas State Bank account—which we previously held was correctly determined to be Robert's separate property—into the #5657 account. Monica asserts that "the checks do not reflect the account number that [Robert] testified to and the total amount of the checks was far less than the account balance in said accounts at the time of the trial before the jury."

Having reviewed the evidence cited by Monica, we find that the cleared checks do indeed reflect deposits totaling approximately $32,000 made by Robert from the Texas State Bank 602 account into an AG Edwards account. The cleared checks do not reflect the AG Edwards account into which the funds were deposited. However, Robert later testified that the checks were deposited into the AG Edwards account he called his "cash account." Robert testified that he held two accounts at AG Edwards—an "IRA" and a "cash account." Robert's testimony and the exhibits introduced at trial indicate that the "IRA" is AG Edwards #5657 and the "cash account" is AG Edwards #5621. Thus, these checks, which were intended to evidence transfer of separate funds into the #5657 account, do not accomplish their seeming purpose. The cleared checks are, instead, evidence of separate funds deposited into the #5621 account.[15] We therefore agree with Monica that the checks are no evidence of separate funds deposited into the #5657 account.

Robert points us to testimony, which he asserts amounts to sufficient evidence to trace the funds in the #5657 account to an IRA listed in the prenuptial agreement.

_____

[15] Because the #5621 account was determined by the jury to be 100 percent community property and neither party challenges that characterization, we do not address whether the jury erred in so characterizing the #5621 account.

27

Robert testified that the funds in the New York Life Mainstay IRA account listed in the prenuptial agreement were transferred to open the #5657 account with AG Edwards. However, Robert provides no documentation regarding the New York Life Mainstay account; specifically, he provides no documentation evidencing the balance of the New York Life Mainstay account at the time it was closed such that we can trace it to the opening balance of the #5657 account. *Mock v. Mock*, 216 S.W.3d 370, 373 (Tex. App.—Eastland 2006, no pet.) (holding that the community property presumption prevailed where wife failed to trace the assets in the allegedly separate account with any documentary evidence); *see also Walton*, 879 S.W.2d at 946; *Vandiver*, 4 S.W.3d at 302. We are therefore not persuaded that Robert's testimony, alone, amounts to sufficient tracing evidence.

In sum, absent additional evidence, we cannot conclude the jury's characterization of AG Edwards #5657 as eighty percent Robert's separate property was supported by clear and convincing evidence. Because it was possessed by Robert during the marriage, the account was presumed to be community property, and he bore a heavy burden to establish otherwise. *See* TEX. FAM. CODE ANN. § 3.003(a)-(b); *Walton*, 879 S.W.2d at 946. The cleared checks showing deposits from Robert's separate account into an AG Edwards account—the only documentary evidence apparent in the record reflecting separate funds flowing to an AG Edwards account—were clearly not deposited into the #5657 (the "IRA") account. No reasonable juror could have formed a firm belief or conviction based on this evidence alone that the #5657 account included Robert's separate funds. In other words, Robert's testimony attempting to link the account to the

prenuptial agreement was not enough. We conclude that the community property presumption should have prevailed and the account should have been characterized as 100 percent community property. It likewise follows from this that the jury's valuation of the community estate at $144,800 was not supported by the evidence. With both AG Edwards accounts characterized as 100 percent community property, we conclude that the correct community estate valuation by the jury would have been $204,000.[16]

Finally, we conclude that, in light of the foregoing, the trial court abused its discretion in entering a divorce decree that memorialized these characterizations and valuations by the jury. In the final divorce decree, the trial court ordered that Monica receive $72,400 as her portion of the community property valuation determined by the jury—i.e., half of $144,800. However, the record in this case demonstrates that the jury's characterization of the #5657 account as partially Robert's separate property was not supported by clear and convincing evidence. *See Chavez*, 269 S.W.3d at 766. And entering the decree on the basis of this unsupported characterization was an abuse of discretion by the trial court that materially affected the just and right division of the community estate. *See id.* Under the evidence presented at trial, the jury should have characterized both AG Edwards accounts as one hundred percent community property, and the community property estate should have been valued at $204,000. Half of this amount would have been $102,000—$29,600 more than Monica received in the decree issued by the court. Therefore, the trial court clearly abused its discretion in entering a final decree that: awarded Robert $59,200 as his separate property from the #5657

---

[16] AG Edwards #5621 was valued by the jury at $130,000, and AG Edwards #5657 was valued at $74,000, both of which values we affirmed in Part V of this opinion.

account; and awarded Monica only $72,400 as her share of the community property. Robert was not entitled to a separate property award based on the AG Edwards account; Monica was entitled to a larger community property award, as a result; and this error by the trial court materially affected the just and right division of the parties' estate.

Monica's second cross-issue is sustained.

## B. Valuation of Monica's Separate Property

By her third cross-issue, Monica challenges the portion of the decree memorializing the jury's verdict that an heirloom ring Robert gifted her was valued at $10,000, arguing that the jury's answer as to the ring's value was against the great weight and preponderance of evidence.[17] Monica asserts that the only evidence at trial concerning the value of the ring was Robert's testimony that the ring was worth more than $20,000. We accept this assertion as true as it is not disputed by Robert and is supported by the record. *See* TEX. R. APP. P. 38.1(g).

Under a factual sufficiency standard, the reviewing court determines whether the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (citation omitted). Given that Robert's testimony was the only evidence as to the ring's value introduced at trial, there was no evidence supporting the jury's verdict that the ring was worth only $10,000. In fact, the only evidence submitted as to the ring's value conclusively established a different verdict than the one issued by the jury. *See Cadle Co. v. Ortiz*, 227 S.W.3d 831, 834-35 (Tex. App.—Corpus Christi 2007, pet. denied) (citing *Ponce v.*

---

[17] Neither party contests the jury's characterization of the ring as 100 percent Monica's separate property.

*Sandoval*, 68 S.W.3d 799, 806 (Tex. App.—Amarillo 2001, no pet.)). We therefore conclude that the jury's verdict that the ring was worth $10,000 was so against the great weight and preponderance of the evidence that it was manifestly unjust. And because the jury's verdict was not supported by the evidence, the trial court clearly abused its discretion in entering a decree memorializing that verdict. *See Chavez*, 269 S.W.3d at 766; *Magness*, 241 S.W.3d at 912. Monica's third cross-issue is sustained.

## C. Division of Property

By her fourth cross-issue, Monica argues that the trial court's division of the community property in this case was so disproportionate as to be inequitable. Monica argues that the division was not supported by the evidence and was therefore an abuse of discretion.

"In a decree of divorce . . . , the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party . . . ." TEX. FAM. CODE ANN. § 7.001 (West 2006). The trial court may order an unequal division of the community property when a reasonable basis exists for doing so. *Fischer-Stoker v. Stoker*, 174 S.W.3d 272, 277 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). But the division of property must not be so disproportionate as to be inequitable, and the circumstances must justify awarding more than one-half of the community property to one party. *See id.*; *see also Prague v. Prague*, 190 S.W.3d 31, 41 (Tex. App.—Dallas 2005, pet. denied). A trial court may consider the following factors in making a disproportionate division of property: "(1) the spouses' capacities and abilities; (2) benefits which the party not at fault would have derived from the continuation of the

31

marriage; (3) business opportunities; (4) relative physical conditions; (5) relative financial conditions; (6) disparity of ages; (7) size of separate estates; (8) the nature of the property; and (9) disparity of earning capacity." *Viera v. Viera*, 331 S.W.3d 195, 203-04 (Tex. App.—El Paso 2011, no pet.) (citing *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981)); *see Zorilla v. Wahid*, 83 S.W.3d 247, 252 (Tex. App.—Corpus Christi 2002, no pet.), *disapproved on other grounds*, *Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011).

> To disturb a trial court's division of property . . . , the appellant must show the trial court clearly abused its discretion by a division . . . that is manifestly unjust and unfair. *See Ridgell v. Ridgell*, 960 S.W.2d 144, 147 (Tex. App.—Corpus Christi 1997, no pet.) (property division); [citation omitted]; *Kuehn v. Kuehn*, 594 S.W.2d 158, 161 (Tex. App.—Houston [14th Dist.] 1980, no writ) (property division). In making this determination, we look to whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules and principles. *See* [*Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)]. Our analysis focuses on a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion?; and (2) Did the trial court abuse its discretion by causing the property division or child support order to be manifestly unjust or unfair? *See In re De La Pena*, 999 S.W.2d 521, 527 (Tex. App.—El Paso 1999, no pet.)[; s]*ee also Zieba v. Martin*, 928 S.W.2d 782, 786 (Tex. App.—Houston [14th Dist.] 1996, no writ) (finding both legal and factual sufficiency are relevant factors under the abuse of discretion standard). A trial court abuses its discretion when it rules without supporting evidence. [citation omitted].

*Evans v. Evans*, 14 S.W.3d 343, 345-46 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

As discussed in the background section above, the marital property awarded to Monica, with values ascertainable by the decree, totaled approximately $164,000.[18]

Monica asserts this amount represents only ten percent of the value of the marital estate.

---

[18] This total includes the $25,000 reimbursement award, $72,400 as her portion of the community property, personal property from the community estate valued at approximately $42,000, and a $25,000 judgment as her portion of the community estate's property that was indicated to be sold. Monica was also awarded three community bank accounts and two AG Edwards investment accounts, but the amount of funds in those accounts was not included in the decree.

Monica appears to base this assertion on the following amounts awarded in the decree to Robert, which totaled approximately $1,001,000: $72,400 as his portion of the jury's community property verdict; personal property from the community estate valued at approximately $170,000; the remainder of the personal property indicated to be sold, which was valued at $242,707.95 after subtracting the $25,000 judgment owed to Monica; and all of the accounts listed in "Exhibit D" of the decree, the listed values for which accounts totaled approximately $516,000.

We note at the outset that all of the accounts listed in Exhibit D were either closed accounts, accounts owned by other family members and not Robert and Monica, or alternate account numbers for accounts covered by the prenuptial agreement or accounts submitted to the jury for characterization and valuation. The evidence before the trial court shows that the first account on Exhibit D, a Texas State Bank account with a number ending in 690 with a listed value of $105,464.06, was an account closed by Robert during the marriage and transferred into the Texas State Bank number 602 account we previously held to be Robert's separate property.[19] The second account, a Texas State Bank account with a number ending in 190, has a "pending value," and the evidence before the trial court shows it to be the account number for a loan Robert took out for legal expenses during the divorce proceedings. The third account, a First State Bank account with a number ending in 090, has a "pending value," and the evidence before the trial court shows it to be the First State Bank account included in the prenuptial agreement that we previously concluded in Part IX.A.1 of this opinion to be the same as the Texas State

_____

[19] Monica does not address the origin of the funds in the number 690 account by this issue.

33

Bank number 602 account correctly determined to be Robert's separate property. The fourth account, a First State Bank account with a number ending in 534, has a "pending value," and no witness at trial could identify this account. The fifth account, a "Mainstay Funds" account with a number ending in 144, is clearly the New York Life IRA account included in the prenuptial agreement as Robert's separate property. The sixth account, an AG Edwards account with a number ending in 954, has a "pending value," and Robert's undisputed testimony at trial identified this account as belonging to his mother. The seventh and eighth accounts, AG Edwards accounts with numbers ending in 441-007 and 441-061, have values of $52,875.03 and $45,233.94, and the evidence before the trial court showed these to be alternative numbers for the same AG Edwards #5657 account submitted to the jury for characterization and valuation. The ninth and tenth accounts, AG Edwards accounts with numbers ending in 784-007 and 784-061, have "pending values," and the evidence before the trial court showed these accounts to be IRAs opened by Monica and Robert in their son's name. The eleventh and twelfth accounts, AG Edwards accounts with numbers ending in 524-007 and 524-061, have values of $134,810.83 and $124,979.07, respectively, and the evidence before the trial court showed these to be alternative numbers for the same AG Edwards #5621 account submitted to the jury for characterization and valuation. The thirteenth and final account on Exhibit D, a New York Life Annuity with a number ending in 972, has a "pending value," and is clearly the account number for a life insurance policy in Robert's name, a policy which is addressed nowhere in the divorce decree.

In light of the foregoing, we do not agree with Monica that Robert's share of the

marital property can be fairly characterized to include any of the $516,000 listed for the accounts in Exhibit D. Subtracting that from the $1,001,000 Monica claims Robert received, Robert is left with a total of approximately $485,000, which represents approximately seventy-five percent of the marital estate.

As to the remainder of the division, Robert and Monica received equal shares of the amount determined by the jury to be community property—each received half of $144,800, or $72,400. And for purposes of our analysis here, the various other community accounts awarded to the parties without values listed in the decree do not aid us in our analysis of the rightness of the trial court's division. So, it follows that the next seemingly most disproportionate division of the property was the division of the marital estate's personal property.[20] Robert received $170,000 worth of community personal property to keep and $242,707.95 worth of the personal property indicated to be sold, for a total of approximately $413,000. By contrast, Monica received approximately $42,000 worth of community personal property to keep and a $25,000 judgment as her portion of the community property that was indicated to be sold, for a total of approximately $67,000. In short, Robert received approximately eighty-six percent of the community personal property, and Monica received only fourteen percent.

Monica argues that this disproportionate division was inappropriate because there was no evidence that she possessed any of the advantages considered by trial courts in awarding one party a disproportionate share of the marital estate. Rather, she asserts, the evidence at trial showed that Robert was at fault in the break-up of the marriage; that

---

[20] Neither party challenges the trial court's characterization of the personal property as community property.

35

Robert had a sizable separate estate relative to Monica; and that Robert had superior business opportunities and earning capacities. *See Viera*, 331 S.W.3d at 203-04. These factual assertions are not disputed by Robert and are supported by the record.[21] *See* TEX. R. APP. P. 38.1(g). And Robert does not point us to any evidence that weighs in favor of the disproportionate share of community property awarded to him in the divorce decree.[22]

Thus, we conclude that the trial court's award to Robert of approximately seventy-five percent of the community property listed in the decree was not supported by the evidence. *See Evans*, 14 S.W.3d at 345-46. There was no evidence that Robert was disadvantaged by any of the factors relevant to a disproportionate division, and as such, no reasonable basis existed for awarding him more than one-half of the community property. *See Fischer-Stoker*, 174 S.W.3d at 277. In short, the disproportionate amount of community property awarded to Robert in the divorce decree was inequitable and constituted an abuse of discretion by the trial court. *See id.*; *see also Evans*, 14 S.W.3d at 345-46. Monica's fourth cross-issue is sustained.

## D. Prenuptial Agreement

By her fifth cross-issue, Monica argues that the trial court abused its discretion in not finding the couple's prenuptial agreement "unconscionable as a matter of law" in that it failed to fairly and reasonably disclose Robert's property and financial obligations.

---

[21] Robert's sole argument in response to Monica's fourth cross-issue is that the trial court erred in holding the post-trial hearings and dividing community property without submitting those issues to the jury. For the same reasons given in Part VII of this opinion, we are not persuaded by this argument.

[22] *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 283 (Tex. 1994) (holding that it has never been a part of an appellate court's duties to, itself, engage in a time-consuming review of a voluminous record for evidence).

Premarital agreements are presumed to be enforceable. *Marsh v. Marsh*, 949 S.W.2d 734, 739 (Tex. App.—Houston [14th Dist.] 1997, no writ) (citing *Grossman v. Grossman*, 799 S.W.2d 511, 513 (Tex. App.—Corpus Christi 1990, no writ)). To rebut that presumption, the party seeking to avoid enforcement must prove either that: she signed the agreement involuntarily; or the agreement was unconscionable when signed and the agreement failed to fairly and reasonably disclose the "property and financial obligations of the other party." *See* TEX. FAM. CODE ANN. § 4.006(a) (West 2006); *see also Marsh*, 949 S.W.2d at 739. In reviewing whether the agreement is conscionable, courts have considered factors such as the maturity of the parties, their educational levels and business backgrounds, their experiences with prior marriages, their respective ages, and whether there were motivations to protect children. *See Marsh*, 949 S.W.2d at 741 (citation omitted). "Because disclosure forms the second prong of the test to rebut the presumption of enforceability, lack of disclosure is material only if the premarital agreement is unconscionable." *Id.* at 743; *see also Fazakerly v. Fazakerly*, 996 S.W.2d 260, 265 (Tex. App.–Eastland 1999, pet. denied) ("The issue of unconscionability must be decided by the trial court as a matter of law before the disclosure questions are addressed.").

Here, Monica makes no argument related to the conscionability of the agreement.[23] She contends only that the agreement was unenforceable because it did not adequately disclose Robert's property and financial obligations. Even assuming that is true, absent any argument related to the first prong of Monica's burden—i.e., proof that

---

[23] Neither does Monica point us to any argument made in the trial court regarding unconscionability aside from disclosure.

the agreement was unconscionable—we do not reach the disclosure question.   Based on the foregoing, we cannot conclude that the trial court erred in finding the prenuptial agreement enforceable.   Monica's fifth cross-issue is overruled.

## E.   Custody

By her sixth and final cross-issue, Monica argues that the trial court abused its discretion in entering possession orders that substantially deviated from the family code standard orders.   Monica argues that appellant failed to overcome the presumption that the family code's standard possession orders were in the best interest of the child.

In the spring of 2007, the trial court entered a modified temporary possession order under which Robert was given possession of the couple's child on the first, third, and fourth weekends of the month and for forty-two days in the summer.   This arrangement was entered as the final possession order in the July 2009 final divorce decree.   Having reviewed the possession order temporarily and then finally entered by the trial court, we agree with Monica that it does differ from the standard possession order contained in the family code.   The standard possession order applicable to this case would give Robert possession of the child on the first, third, and fifth weekends of the month and for thirty days in the summer.   *See* TEX. FAM. CODE ANN. § 153.312 (West Supp. 2011) (detailing the standard possession order for parents who reside 100 miles apart or less).[24]

Monica appears to argue that Robert presented no evidence at a January 2007 hearing to justify the deviation from the standard possession orders.   However, Monica has not provided this Court with a record from that hearing, so we are unable to address

---

[24] Although Monica moved from McAllen, Texas to Brownsville, Texas at some point during the divorce proceedings, it is not disputed that the parties have at all times lived within 100 miles of each other.

her arguments related to the evidence, if any, presented at that hearing. *See Appleton v. Appleton*, 76 S.W.3d 78, 87 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (holding that the burden of providing a record showing error requiring reversal is on the appellant) (citing *Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex. 1990); *Budd v. Gay*, 846 S.W.2d 521, 523 (Tex. App.—Houston [14th Dist.] 1993, no writ)). Regardless, this issue ultimately addresses the final possession order entered by the trial court, so we will consider any evidence relevant to possession cited by the parties and contained in the record before us.[25]

As Monica posits, it is true that the family code includes a rebuttable presumption that the standard possession order "provides reasonable minimum possession of a child for a parent named as possessory conservator or joint managing conservator" and "is in the best interest of the child." TEX. FAM. CODE ANN. § 153.252(a)-(b) (West 2008). The party seeking a deviation from the standard possession order has the burden to establish that the modification is in the best interest of the child. *Prause v. Wilder*, 820 S.W.2d 386, 387 (Tex. App.—Texarkana 1991, no writ). But it is within the discretion of the trial court to determine what is in the best interest of the child. *E.C. v. Graydon*, 28 S.W.3d 825, 828 (Tex. App.—Corpus Christi 2000, no pet.); *Prause*, 820 S.W.2d at 387. "[T]he standard possession order serves as a tool for determining possession, and the court has

---

[25] Monica attaches to her brief an affidavit detailing the proceedings on the temporary possession order and her opinions regarding the propriety of the temporary order. But we are unable to consider that affidavit as it was filed for the first time on appeal and is, therefore, not a part of the appellate record subject to our review. *See Gulf Oil Corp. v. Southland Royalty Co.*, 478 S.W.2d 583, 591 (Tex. Civ. App.—El Paso 1972), *aff'd*, 496 S.W.2d 547 (Tex. 1973) (holding that our duty, as an appellate court, is to consider only the testimony adduced and the evidence tendered and/or admitted before the trial court); *see also Noble Exploration v. Nixon Drilling*, 794 S.W.2d 589, 592 (Tex. App.—Austin 1990, no writ) (holding that documents not introduced into evidence at trial are not properly included in the record and cannot be considered on appeal); *City of Galveston v. Shu*, 607 S.W.2d 942, 945 (Tex. Civ. App.—Houston [1st Dist.] 1980, no writ) (same).

the ability to alter the terms when it is in the best interest of the child and devise a possession order that is suitable for the custody situation at issue." *Graydon*, 28 S.W.3d at 829-30. Because the trial court is in the best position to observe the demeanor and personalities of the witnesses and can feel forces, powers, and influences that cannot be discerned by merely reading the record, we will not disturb the trial court's determination absent an abuse of discretion. *Id.* at 829.

Here, it is undisputed by the parties that Monica moved from McAllen, Texas to Brownsville, Texas at some point during the pendency of the divorce. This increased the distance between the parties' residences by over sixty miles. The parties appear to agree that this was the motivating factor behind the trial court's modification of the temporary possession order, which increased the length of Robert's periods of possession and which was then finalized in the divorce decree. Monica points to evidence at trial which she claims shows that the increase in distance between the parties was irrelevant; she contends that the evidence at trial showed that Robert has not held a steady job in the last nine years (i.e., his schedule is flexible) and that, since Monica moved to Brownsville, Robert had been having lunch with the couple's child at his school three to four times a week. Monica contends that this evidence shows that Robert should have been able to comply with the standard orders even with the greater distance involved. Monica also points to evidence: that Robert did not take the couple's child to his soccer and baseball games and birthday parties for the child's friends when he had possession; that the child had a close relationship with his grandparents and cousins and was unable to see them because of Robert's possession on most weekends of the month;

and of an outcry made by the couple's child involving allegedly inappropriate behavior by Robert while he was bathing the child. Monica contends that this evidence weighs against the trial court's order that increased possession time for Robert was in the child's best interest.

Here, it is clear that the trial court gave great weight to the increased distance between the parties, which justified the greater-length periods of possession by Robert; and did not give determinative weight to the foregoing evidence cited by Monica regarding Robert's employment status, Robert's decisions and behavior during his periods of possession, and the alleged outcry by the child in making its determination that the best interests of the child required a variation from the standard possession orders. And because the trial court was in the best position to observe the demeanor of the witnesses and otherwise judge the credibility of the evidence related to the custody situation in this case, we will not disturb its weighing of the evidence in this case and will defer to its discretionary determination. *See id.* at 829-30. In other words, there was evidence supporting a deviation from the standard possession order, and the trial court did not abuse its discretion in entering the varying order. *See id.* at 829; *see also Prause*, 820 S.W.2d at 387. Monica's sixth cross-issue is overruled.[26]

---

[26] In connection with the trial court's final possession order, Monica timely requested findings of fact from the court. *See* TEX. FAM. CODE ANN. § 153.258 (West 2008) ("[I]n all cases in which possession of a child by a parent is contested and the possession of the child varies from the standard possession order, on written request . . . , the court shall state in the order the specific reasons for the variance from the standard order."). The trial court did not enter the requested findings. Monica urges that, should this Court find that the evidence supporting the deviation in this case was sufficient, the proper disposition of this cross-issue would be to remand the custody issue to the trial court for entry of the requested findings. However, Monica has not explained why she was harmed by the trial court's failure to enter the requested findings. *See* TEX. R. APP. P. 44.1. And in any event, "[t]he test for determining whether the complainant has suffered harm [by the trial court's refusal to enter findings of fact] is whether the circumstances of the case would require an appellant to guess the reason or reasons that the judge has ruled against it." *Gray v. Gray*, 971 S.W.2d 212, 217 (Tex. App.–Beaumont 1998, no pet.) (citing *Sheldon Pollack Corp. v. Pioneer*

## X. Conclusion

Having held that the trial court abused its discretion in entering the jury's reimbursement verdict in the divorce decree, characterizing AG Edwards #5657 as partially Robert's separate property, valuing the heirloom engagement ring at only $10,000, refusing to submit the number 602 Texas State Bank Account to the jury for characterization, and generally dividing the community estate in an inequitable manner, we reverse the trial court's division of property and remand this case to the trial court for a new trial as to the number 602 account, in particular, and a new division of the estate after the new trial and in light of the holdings in this case. We affirm the remainder of the divorce decree.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
15th day of June, 2012.

---

*Concrete*, 765 S.W.2d 843, 845 (Tex. App.—Dallas 1989, writ denied); *Fraser v. Goldberg*, 552 S.W.2d 592, 594 (Tex. Civ. App.—Beaumont 1977, writ ref'd n.r.e.)). Here, where she appears to agree by the argument and analysis in her brief that the trial entered the deviating order because of the increased distances between the parties' residences, Monica cannot credibly claim that she was forced to guess the trial court's reasons for entry of a possession order that deviated from the standard order. We are therefore not persuaded by Monica's urging that we remand this issue for findings of fact by the trial court.